## THE LIZZIE W. VIRDEN.

*(Circuit Court, E. D. New York. September, 1881.)*

1. CHARTER-PARTY—PERILS OF THE SEAS.

Ship-owners, not the charterers, take the risk of the condition of the vessel, the risk of there not being heat and steam, and the risk of so cleansing the vessel as to take the cargo safe from damage by petroleum, notwithstanding heat and steam.

2. SAME—DAMAGE FROM PETROLEUM.

In the absence of a clause in the charter-party providing for the cleansing of the vessel in a specified manner, or for taking only specified cargo, or for freeing the vessel from petroleum damage to specified cargo, damage from petroleum occasioned by leakage, diffusion, or impregnation is not a peril of the sea.

Motion for reargument.

*F. A. Wilcox,* for libellants.

*R. D. Benedict,* for claimants.

BLATCHFORD, C. J.   One of the grounds of the motion for a rear-gument in this case is that the court erred in its former decision in saying that "the staining of the almonds by steam and sweat, or by sea water, was not allowed for." Elsewhere, in its decision, the court said that "no allowance was made by the district court for damage by the steam or sweat of the hold, aside from petroleum damage, or for any injury by steam or sweat which did not convey petroleum." The interlocutory decree of the district court ordered that the libellants recover "the damages by them sustained by reason of the impregna-tion, during the voyage mentioned in the libel, of the almonds in said libel mentioned, with the flavor and odor of petroleum." The com-missioner was directed to ascertain and report "the amount of such damages." The presumption is that the district court allowed only for such damage.

It is contended for the claimants that there was actual damage to almonds by steam and sweat, and also by sea water, as perils of the sea; that the steam and sweat, and the sea water, wet and stained the bags, and thus injured almonds in such bags, aside from any impreg-nation of them by petroleum taste or odor; that there was no stain-ing of bags by actual contact with petroleum, except as petroleum impregnation was conveyed by steam or sweat or sea water; and that thus, where there was this wetting and staining, there was injury from that cause, and further distinct injury from the petroleum fumes which the wet absorbed and imparted to the almonds in the bags.  The claimants refer to the testimony of Josiah Rich, Jr., to the effect that where there is a stain on the bags which almonds come in, the mere stain affects their market value; that water stains affect the market value of the nuts; and that where there is a stain of the bags by steam or sweat or sea water, the articles in the bags have to be examined to get at the extent of the injury.  This testimony is very general.  The witness did not examine any of the bags or almonds in question.  The claimants also refer to the testimony of Josiah Rich, Sr., to the effect that it is an injury to bags of almonds if they are stained.  The almonds arrived at New York about Febru-ary 5, 1874.  On the twentieth of February, 1874, this witness, as a fruit broker, in conjunction with C. B. Wyckoff, examined the almonds called the Nordlinger lot.  This lot comprised 850 bags Wallis & Co. and 425 bags F., of Ivica almonds, in bill of lading No. 2, and 798 bags G. A., of Tarragona almonds, in bill of lading No. 1.  In respect to this lot the district court and this court allowed as damage $725.99, made up thus: 1½ cents a pound on 3,570 pounds in 62 bags of

the 850 Wallis & Co., Ivica, $53.55; 1½ cents a pound on 31,180 pounds in 272 bags of the 425 F., Ivica, $467.70; and 1 cent a pound on 20,474 pounds in 190 bags of the 798 G. A., Tarragona, $204.74.

Mr. Rich and Mr. Wyckoff reported in writing February 20, 1874, that "the whole parcel"—that is, all the 2,073 bags so examined by them—were "more or less impregnated with the odor of petroleum;" that the 62 bags Wallis & Co., Ivica, and the 272 bags F., Ivica, and the 190 bags G. A., Tarragona had been "actually stained and damaged with petroleum;" and that "the damage sustained by the whole parcel"—that is, the 2,073 bags—"in consequence of the stains and odor of petroleum" was $725. On the twenty-fifth of February, 1874, Mr. Rich and Mr. Wyckoff examined the almonds called the Dean and Hyberger lot. This lot comprised 750 bags G. A., of Tarragona almonds, in bill of lading No. 1. In respect of this lot the district court and this court allowed as damage $215. Mr. Rich and Mr. Wyckoff reported in writing February 25, 1874, that "the whole lot or parcel"—that is, the 750 bags—was "more or less impregnated with the odor of petroleum;" that 190 bags of the 750 had been "actually stained and damaged with petroleum;" and that "the damage sustained by the whole parcel"—that is, the 750 bags—"in consequence of the stains and odor of petroleum" was $215. On the first of May, 1874, Mr. Rich and Mr. Wyckoff and James M. Heron examined the almonds out of the shell, known as the Gomez & Arguimbau lot. This lot comprised 100 bags G. A., of Malaga almonds, in bill of lading No. 3. In respect of this lot the district court and this court allowed as damages $571.23, being 3½ cents a pound on 16,321 pounds. Mr. Rich, Mr. Wyckoff, and Mr. Heron reported in writing May 1, 1874, that they found the almonds in the 100 bags "damaged by contact with and odor of petroleum;" and that the extent of said damage was an average of 3½ cents a pound "on the whole lot or parcel."

On his examination as a witness for the libellants, at the trial in the district court, in April, 1878, Mr. Rich testified to the correctness of these three reports, and stated that they laid aside almonds damaged by sea water, and did not include them in the reports. In October, 1878, on the reference as to damage, the claimants examined Mr. Rich as a witness on their part, and he then stated, as above, that it is an injury to bags of almonds if they are stained; and also, on his direct examination, gave the following testimony, to which the claimants direct attention:

" *Question.* Supposing those bags of almonds that you examined had been stained to the extent that they were but with sea water and sweat of the hold, how would that damage have compared with the damage as it was? *A.* It is hardly fair to make a comparison. Damage by sea water is damage by itself, and damage by odor of petroleum is a different thing altogether. You can't compare them. One may be very serious, and the other may be very serious. *Q.* Supposing these bags were stained by sea water or sweat of the hold to the same extent as they were stained in this particular case, what would have been the damage to the almonds in that case from that stain, aside from petroleum? *A.* The external appearance of the stain might be as great on the surface of the bags if they are stained by sea water, as if stained by anything else. *Q.* What would be the extent of injury from that stain? *A.* It is pretty difficult to arrive at a very accurate solution of that question. They would have been damaged, unquestionably, if the stains had been simply sea water stains, but not to more than half the extent that we estimated the damage by what we supposed to be petroleum stains. *Q.* The presence of the stain of sea water or sweat of the hold always carries with it the idea of injury to the nuts under the stain from sea water or sweat? *A.* Yes. *Q.* You include that injury in what you have just said, do you not? *A.* Yes."

But Mr. Rich, on the same reference, also testified as follows on his direct examination for the claimants in regard to the report as to the Dean & Hyberger lot:

" *Question.* What amount of the $215 did you apply to the 190 bags? *Answer.* It is pretty hard to separate. The principal part of this allowance of $215 was intended to apply to the 190 bags. The balance of the 750 bags we supposed to be more or less injured by the odor of petroleum, and we included something in consequence of that; but the principal damage that the whole lot sustained was included in the 190 bags. Of this $215, I suppose, there is at least $150 of it applied to the 190 bags. *Q.* Was there a difference in the injury, in the condition of the 190 bags, so far as the odor of petroleum was concerned, from the condition of the others, or were they all affected with the odor of petroleum? *A.* The odor of petroleum, we thought, extended more or less through the whole lot, but the 190 bags were more particularly affected by it, because they had actually come in contact with it. I think there was a difference. *Q.* You say $150, you think, would be perhaps applicable to the 190 bags. How much of that would be allowed for damage occasioned by stain, and how much by odor? *A.* The stained bags could be remedied by buying new bags. *Q.* Would there be injury to the nuts, if it were an injury from sea water that had made the stains? *A.* There would be. *Q.* How much would that amount to? *A.* It would be hard to say. They were more injured, of course, than the others, but the per cent. is very difficult to arrive at; 190 bags had stains on them, and those stains being odorous, and a similar odor in the whole lot, we put in the whole lot as more or less affected, but we considered the effect on the balance of the lot as very slight indeed—that is, the 560 bags. The damage to that was very slight, because they hadn't come in contact with what stained the other bags. I suppose, as I said before, the damage

to the 190 bags was the bulk of the damage that the lot sustained. *Q.* Did you make any estimate at the time—divide off these damages? *A.* I did not. We estimated the damage sustained by the whole parcel. *Q.* The damage to the 190 bags alone, that you did not estimate? *A.* No, sir; not by itself."

On the same reference Mr. Rich also testified as follows, on his direct examination for the claimants, in regard to the report as to the Nordlinger lot:

"*Question.* Did you make any estimate at that time of the amount of damage that had been sustained by those that you speak of there as having suffered by contact with stain? *Answer.* We thought that the bags that had actual stains on them were considerably more damaged than the others, but I do not know how we got at the specific estimate just now; but we did make an estimate of the damage to each parcel, and then we added something for those that were not stained, and it was about in the same proportion as the other nuts—the lot in the other exhibit."

On the same reference Mr. Rich also testified as follows, on his direct examination for the claimants in regard to the report as to the Gomez & Arguimbau lot:

"*Question.* Did you make any distinction of the damage suffered by any portion of that 100 bags which had been stained, as distinct from those that had not been stained? *Answer.* There were some bags that were not actually stained, and we did make a distinction. Those that were stained were damaged worse than those that were not stained, but it is so long ago I can't distinctly remember what proportion was actually stained and what was not. Those that were stained were damaged certainly twice as much as those that were not. *Q.* You mean that those damaged in Exhibit E (the Nordlinger lot) was about in the same proportion as Exhibit F, (the Dean & Hyberger lot?) *A.* Yes. *Q.* Do I understand you that it was proportionate to the different amounts of almonds in the two lots? *A.* Yes. We estimated the whole damage at $215, and I said $150 of that applied to those that were stained. I should say those that were stained were damaged two-thirds more than those that were not stained."

Reference is also made by the claimants to testimony given by Mr. Heron, on his direct examination on the part of the claimants, on the reference as to damages in regard to the Gomez & Arguimbau lot, as follows:

"*Question.* Did this lot of 100 bags suffer any injury in their market value by reason of the stained condition of the bags? *Answer.* They did. *Q.* Aside from the injury to the market value which arose out of that stained condition of the bags was there any injury to their market value? *A.* There was in some cases in some bags. *Q.* In how many bags out of the hundred? *A.* I could not say. That is where our loss comes in. We threw them out as mouldy. *Q.* Any time, aside from the injury to the market value occasioned by the stain on the bags, and aside from those that you threw out as mouldy,

was there any other injury? *A.* No, not when they were selected—made over again. When I examined them in the store I considered them damaged then with the smell of petroleum. *Q.* How did the examination that you made of them in the store compare with the subsequent examination that you made? *A.* Altogether different. *Q.* Which was the more complete examination? *A.* That in our own store. *Q.* Do you say now that there was any injury to those nuts except the injury arising from the stained condition of the bags and the mouldy nuts; from your personal knowledge, I mean? *A.* No, I think there was none; no damage beyond the stain and mould, as I subsequently ascertained."

Mr. Heron signed the report of May 1, 1874. He was examined as a witness for the libellants on the trial in the district court, in April, 1878. He was in the business of buying and selling almonds. He stated in such testimony that he found some of the 100 bags stained on the outside, apparently with oil; that some of the nuts, all of them being almonds out of the shell, were mouldy, and some had the smell of kerosene; and that some near the stain tasted of petroleum. He purchased these almonds. He exposed them to the air and picked some of them over, and then sold some of them as sound, throwing out what were soft and mouldy, and getting rid of the petroleum smell. On his cross-examination on the reference he testified that when he examined them to make the report, he considered them damaged, on account of petroleum, in their market value, at the amount stated in the report; that his view at the time was that he gave for them all that they would have brought in the market, in the damaged condition in which he at the time supposed them to be; that he gave them a thorough examination with a view to making the report; and that all the nuts which were damaged by mould had the smell of petroleum.

The claimants contend that sea water and sweat were not an inconsiderable cause of damage to all of the almonds.

Reference is made by the claimants to the testimony of John L. Piper, a custom-house appraiser, who, on being shown a report dated June 22, 1874, stated that he signed it, and that the cause of damage stated in it to the almonds mentioned in it was sea water and the heat of the vessel. This report does not appear to be in evidence. He was shown another report, dated July 27, 1874, signed by him, containing the words "and petroleum," and the words "and permeated with petroleum oil," which report does not appear to be in evidence. Elsewhere, in the same testimony, he states that he recollects examining "100 bags of shelled almonds," and "some 50 or more bags of shelled almonds," and other articles from this vessel,

about the middle of February; that he found the articles more or less damaged; that "the cause of the damage was petroleum oil and sea water, slightly; the heat of the vessel also;" that the most of the damage was petroleum oil, indicated in the appearance, the odor, and the taste; and that he gave the damage all those tests, and came to the conclusion that the most of it was petroleum oil. The claimants contend that the evidence shows that the 100 bags constituting the Gomez & Arguimbau lot were on the top of the other cargo, and were stained, and did not come in contact with petroleum, and therefore must have been stained by steam and sweat and sea water; and that it must be inferred from the evidence that the stains in the other lots were from the same cause. The damage resulting from such staining of the bags, it is contended, was a peril of the sea, which would have existed under the circumstances of this voyage if the vessel had never had any petroleum in her. This damage, it is claimed, has been included in the allowance made.

In reply the libellants contend that the proof shows that the damage did not arise from a peril of the sea, but from petroleum, both by actual contact and by impregnation; and that every one of the three lots actually came in contact with petroleum. They refer to the language, before cited, of the three reports in regard to the three lots, and to the testimony of various witnesses. Wyckoff, who signed all three of the reports, testified at the trial that he examined the three lots and that the report was correct; that the stains on the bags in the Nordlinger lot were principally by petroleum oil; that by smelling, feeling, and tasting he concluded the stains were petroleum stains; that he examined the Gomez & Arguimbau lot by touching, tasting, and smelling; and that he also examined the Dean & Hyberger lot.

The clear deduction from all the evidence is that there was no damage by staining or wetting which did not also have the impregnation of petroleum. Some almonds may ultimately have been discarded as mouldy, but the petroleum damage to them rendered them unmerchantable at the time they were delivered from the vessel, and when the libellants were entitled to have them merchantable. It was uncertain how they would turn out, and what the speculation of buying them would result in, and whether the petroleum odor and smell could be got rid of. All the witnesses who examined the almonds carefully, speak of the main damage as being the petroleum. There were sea water and sweat, as the port wardens say, but the sea water and sweat were vehicles for the petroleum fumes. The observation

of the port wardens was very superficial, and extended to only a few bags. Bourdette did not handle, taste, or smell the almonds, nor does it appear that Leaycroft did. The witnesses who applied feeling, smell, and taste, found petroleum. Petroleum was the greatest cause of damage, very clearly. There was petroleum damage where bags were stained, and there was petroleum damage where bags were not stained; but there was no sea water or sweat unaccompanied by petroleum damage.

The claimants contend that one-third of the $725.99 and of the $215 should be stricken out as damages, and that the $571.23 should be stricken out entirely, on the view that the amounts so to be stricken out appear to be damage by sea water and sweat, and not by petroleum. But a careful consideration of the evidence and of the argument for the claimants leads me to the same conclusion as before—that more has not been allowed than ought to have been for purely petroleum damage, and therefore that nothing was allowed for damage by steam and sweat, and by sea water. The claimants contend that whether cargo be damaged by the direct effect of the heat of the vessel, or by direct contact with the sweat of the hold, or by the disengaging of vapor from other cargo or from the vessel herself, the damage is, in each of such cases, the result of the heat and dampness, and is due to perils of the sea. Various cases are cited where the carrier was held not liable,—the loss of molasses, through fermentation of it by heat; the rusting of cargo through sweat occasioned by the heat; the leaking of casks of oil from heat in the hold; the leakage of lard in hot latitudes; injury to wheat by carrying it with kerosene; injury to flour by carrying it with sugar,— and it is urged that as the libellants knew when they chartered the vessel that she was to take out a cargo of petroleum, they are chargeable with what was the necessary result of the heating and sweating of the hold in the liberation of the vapor of petroleum from the wood of the vessel. There is a clear distinction between all such cases and the present case. The ship-owners, notwithstanding any knowledge the charterers had, guarantied in writing, by the charter party, that the said vessel, in and during the said voyage, shall be kept tight, staunch, well-fitted, tackled, and provided with every requisite for a voyage back to New York with any lawful merchandise the charterers should think proper to ship. The ship-owners, not the charterers, took under this contract the risk of the condition of the vessel, the risk of there not being heat and steam, and the risk of so cleansing the vessel as to take the cargo safe from petroleum dam-

age, notwithstanding heat and steam. It was easy to have put in a clause providing for the cleansing of the vessel in a specified manner, or for taking only specified cargo, or for freeing the vessel from petroleum damage to specified cargo.

The motion for a reargument is denied.

See 8 FED. REP. 624.