## CHURCH COOPERAGE CO. et al. v. PINKNEY et al.

### (District Court, S. D. New York. August 6, 1908.)

**1. SHIPPING—CHARTER PARTY—DAMAGE FROM ODOR.**

A charter party, reciting that the vessel is carrying creosote on the preliminary voyage, also contained the printed clause that the vessel "shall be tight, staunch, strong, and in every way fitted for the voyage," with a written insertion, "Vessel agrees to have holds as clean as possible." *Held* that, where the vessel had been so cleaned, the charterer could not recover for the impregnation of shooks by the odor of creosote, which rendered them unfit for wine casks.

**2. RELEASE—CONSTRUCTION AND OPERATION.**

Where some of the discharged cargo came out with stains and external damage, and a compromise was made by deducting $100 from the freight, which was acknowledged by a receipt "in full settlement of our claim for damage to cargo delivered in bad condition," such receipt did not release a claim for odor or taint that was not discovered until afterward.

In Admiralty. Final hearing. Action for breach of charter party and damage to cargo.

The libelants sued upon a charter party made to the Gulf Cooperage Company to recover $35,000 alleged damages to a cargo of shooks shipped on the bark Alexandra at Galveston for a voyage to Buenos Ayres. The charter party recited that the bark was "reported sailed from Glasgow January 10th, for Port Arthur, Tex., with cargo of creosote." It had also the usual printed provision that the vessel "shall be tight, staunch, strong, and in every way fitted for the voyage." The cargo was "to be not exceeding 40,000 whisky barrel shooks, and heads in bundles, and 265 net tons hoop iron packed flat in bundles." The latter part of the charter party had a written insertion: "Vessel agrees to have holds as clean as possible." Evidence was given that the bark had been cleaned by the master and shore laborers, and that one Thompson, the secretary and treasurer of the Gulf Cooperage Company, then accepted the ship and supervised the loading of the cargo. Afterward he required a portion of the between-deck planking to be removed, which was done, and the loading was then resumed and completed without further objection. The vessel made the voyage, and discharged the cargo in apparent good order, except that a few bundles of shooks came out stained. Upon settlement of the freight, a compromise was made by deducting $100, which was acknowledged by a receipt "in full settlement of our claim for damage to cargo delivered in bad condition." It was alleged that, after the shooks had been sold and had been made up into wine barrels, the wine showed a flavor of creosote, so that the purchasers returned many of them as unfit for wine casks.

Convers & Kirlin, for libelants.

Wing, Putnam & Burlingham, for respondents.

HOUGH, District Judge (after stating the facts as above). Two legal questions are presented by the pleadings: (1) The effect of the release executed at Buenos Ayres; and (2) the meaning of the phrase of the charter, "Vessel agrees to have holds as clean as possible," taken in conjunction (1) with the recital of the same document, that the Alexandra was at the date of hiring en route for Port Arthur with a cargo of creosote, (2) with the warranty that she was in every way fitted for the voyage contracted for, and (3) with the warranty of fitness and seaworthiness implied by law. The release does not, in my opinion, cover the claim in suit, which is not for breakage, rust, or stains even of creosote, but for the loss of practically the entire cargo

of wine casks, as receptacles for wine, because of an impregnation by creosote odor, undiscovered and unsuspected when the claim was advanced for which the release was executed.

As to the second query, it is clear that the charter party warranty adds nothing to the warranty implied by law, even if the former be not always referable to the date of contract or time of sailing for loading port, as suggested by Mr. Carver in his comments on Stanton v. Richardson. It is enough for this case that:

"Where there is a contract to carry goods in a ship, there is, in the absence of any stipulation to the contrary, an implied engagement on the part of the person so undertaking to carry that the ship is reasonably fit for the purposes of such carriage." Tattersall v. Nat. S. S. Co., 12 Q. B. D. 300.

That no such stipulation is to be inferred from common knowledge of the fact that on a previous voyage the vessel had carried cargo naturally tending to render her unfit for her next engagement is plainly held by The Lizzie W. Virden (C. C.) 11 Fed. 910, and The Carlotta, 9 Ben. 1, Fed. Cas. No. 2,413.

The question remains, then, whether the special proviso about cleaning holds is a limitation of warranty. I am inclined to think it is, because it is only by so construing the phrase that any meaning can be given it. If the ship, after fulfilling her engagement of unusual cleanliness, is still held to a complete absence of creosote odor, then the meaning of the charter party would be exactly the same, with or without a sentence obviously inserted solely on account of the known creosote cargo and its known characteristics. In this discussion it is assumed that a warranty of "reasonable fitness" is broken by giving to barrel staves a creosote flavor only discoverable by chemical analysis, or by filling the barrels with a delicate alcoholic fluid, viz., wine, although the wine drinker can only discover the taint by taste, not by smell. I do not assent to this assumption, but it is not necessary to pursue the subject.

Whether, however, the construction of the charter and its warranties to which I incline be right or not, it is to me entirely clear that libelants are estopped from asserting the claim in suit. The more important witnesses on this point were examined before me. Both in open court and by deposition libelants have sought to minimize the powers, importance, and authority of one Thompson, who offered the cargo to the Alexandra at Galveston. This insistence has not increased faith in the witnesses who so unanimously hold that Thompson had nothing to do with the loading of the ship; for, if anything can be proven by human evidence, it is that Thompson practically refused to load further cargo unless the 'tween-decks were removed, and, in short, exercised all the authority that inhered in the secretary and treasurer of the chartering company. Decision is not grounded on Thompson's actions; but this endeavor to explain away or deny Thompson has induced me to believe rather those who are truthful regarding him or know him not.

I am therefore of opinion that when this charter was made it was not divulged to respondents that the staves were to be made into wine casks; that as soon as this became known to respondents they

offered to cancel the charter; that libelants' representatives in New York, after consideration, concluded to rely on the cleaning process and to "take their chances"; that the holds of the Alexandra were made as clean as possible, short of taking the ship apart; and that she finally sailed only when her condition was entirely satisfactory to Thompson, who had ample authority to withhold all cargo, if the holds were not satisfactory.

For these reasons the libel is dismissed, with costs.