NAYLOR & CO. et al. v. TERMINAL SHIPPING CO. et al.

(District Court, D. Maryland. November 16, 1916.)

1. SHIPPING ☞121(2)—CHARTER—LOSS OF CARGO BY LIGHTER—UNSEAWORTHINESS.

The owner of a scow chartered to lighter a cargo of ore from a ship, and which sank while being loaded alongside the ship, *held* liable for the loss of her cargo, on evidence which tended to show that she was not overloaded, and that her cargo was properly trimmed, and that the cause of sinking was a leak, which rendered her unseaworthy.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 450, 451; Dec. Dig. ☞121(2).]

2. SHIPPING ☞42—CHARTER—IMPROPER EQUIPMENT.

The charterer of a scow to lighter a ship is entitled to assume that she is ordinarily fitted for the purpose for which the owner chartered her, and is under no obligation to equip her with a pump, when she is not so equipped.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 80; Dec. Dig. ☞42.]

In Admiralty. Suit by Naylor & Co. and the Davidson Chemical Company against the Terminal Shipping Company, the Arundel Sand & Gravel Company, and the London Gate Steamship Company, Lim-

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ited. Decree for libelants against the Arundel Sand & Gravel Company.

Whitelock, Deming & Kemp, of Baltimore, Md., for libelants.

George Forbes, of Baltimore, Md., for respondents Terminal Shipping Co., and London Gate S. S. Co.

Knapp, Ulman & Tucker, of Baltimore, Md., for respondent Arundel Sand & Gravel Co.

ROSE, District Judge. The libelants are the owners of a cargo of pyrites, brought in by the steamship Kingsgate. It was to be delivered at the works of the Davidson Chemical Company, hereafter called the Chemical Company. To make such delivery lighters were required. The Chemical Company chartered scow No. 63 from the Arundel Sand & Gravel Company, referred to hereafter as the Sand Company. The last-named company furnished the lighter and nothing else. The Terminal Shipping Company, which will be styled the Terminal Company, was employed to discharge the cargo.

[1] Somewhere between 6 and 6:30 on the morning of the 2d of February last, the scow sank, carrying down with it more than 400 tons of ore. The latter became a total loss, although the scow was subsequently raised and repaired. There was nothing unusual about the weather conditions. The scow sank, either because it was improperly loaded, or because it was unseaworthy. A number of persons who were on the scow or the ship, and who were eyewitnesses of what happened, have testified. None of them say anything to suggest a lack of care or skill in the stevedoring. Most of them testified that the loading was well and properly done. It is true that those who so say are employés of the Terminal Company, and are in a sense interested witnesses. Nevertheless, there is no contradiction of their story, and it is confirmed by what two United States custom house officers say, and by certain undisputed facts.

That the scow was in trouble was known on the ship more than two hours before it sank. It was then said that she was leaking. The fact that there was such a rumor does not prove it true, but it does show that the explanation now given by the eyewitnesses is not an afterthought. It also appears that the scow did not go down suddenly. The ship used its whistle for an hour or more in a vain attempt to summon assistance. Men went ashore and tried over the telephone to get in touch with a tug before the scow sank. The master of the steamship caused it to be moved from alongside the ship to the stern of it, so as to make sure when she sank she could not damage the ship. The assistant foreman of the stevedores swears that he noticed one corner of the scow going down in the water more rapidly than it should. He opened the hatch, and with his torch he made out that there was a good deal of water in the hold. He jumped down and found it two or three feet deep. He heard the water running in, and, going toward the sound, saw a stream coming in at a point some two or three feet below the deck. His description of what he saw indicates that a seam had opened. He went on deck, and started to lighten the scow by taking some of the ore back on the ship; but

the workmen became fearful for their lives, and the captain of the steamship for the safety of his vessel. Some other witnesses corroborate some part or other of this story. It is possible it is not true, but there was nothing in the tale itself, or in the appearance or manner of the man who told it, to suggest its falsity. It is entirely consistent with everything else that happened that night. It is true it is established that the scow had been in constant use before the accident, and had then not leaked. Perhaps because she had given no trouble, no thought had been given to her condition. At all events she had not been surveyed or recaulked since she came new from the builder's yard over 2½ years before. The superintendent of the shipyard at which, after the accident, she was repaired, testified that the bill for so doing amounted to over $1,900. In these charges were items for labor in caulking, amounting to between 19 and 20 days' work for one man. The witness said that so far as he knew the only caulking done was that required by the repairing of the damage occasioned by the sinking of the scow, and that no caulking was done at any point which was as much as two feet below the deck. Since she was repaired, she has been in continuous service and has not leaked.

I do not feel that this testimony, when given all the weight that should be accorded to it, will justify me in holding that the man who swears he saw the stream of water coming in through the scow's side has perjured himself, for honestly mistaken he could scarcely have been. All the circumstances point to a leak as the cause of the sinking. The scow was not overloaded. If the trouble had been due to improper placing or trimming of the ore, she would have sunk, if at all, much more quickly than she did. Scows are frequently, perhaps usually, though by no means universally, equipped with pumps. If this one had been, its sinking would have been prevented, or at least postponed until, with the return of daylight, a tug could have been found to beach her. The Sand Company does not put pumps on board its scows. When they are in its service, they are usually accompanied by tugs, which can pump them out, if need be.

[2] It was suggested at the hearing that perhaps the Chemical Company, when it hired the scow, was under obligation to put a pump upon her, or to keep a tug alongside of her, or, at all events, assumed all the risks of the absence of pumps and tugs. This suggestion assumes that to common knowledge a scow may spring a leak at any moment, and that one who charters a scow not equipped to control a leak cannot complain if it sinks on his hands. There is nothing in the testimony to show that there is any usage or custom imposing upon the charterer of such a scow a duty so to equip her. Under ordinary circumstances the charterer may assume that the vessel is reasonably fitted for the purpose for which her owner hired her. When the suggestion that another rule was here applicable was made, counsel for the Sand Company were told that they might consider whether they wished to be heard or to submit authorities to that effect. After some days they notified me that they did not.

Shortly after the accident the Sand Company wrote the Chemical Company that by the terms of the charter it was bound to pay $12 a

day for every day until the scow was returned in good order. There-upon the Chemical Company had the scow raised and sent to a ship-yard to be repaired. When the repairs' were finished, the scow was turned over to the Sand Company, to which company the Chemical Company paid $12 for every day which had elapsed from the original delivery of the scow to the Chemical Company to its return to the Sand Company. At the time of the hearing the shipyard bill was still unpaid.

These facts, unexplained, might well throw doubt upon the libelant's own belief in the truth of the story upon which its right of recovery depends. It appears, however, that the agents of the Chemical Company in immediate charge of this department of its work had had little experience in maritime affairs, and that they were at the time very busy and in urgent need of lighters. They did not question the position of the Sand Company, and did not even inquire into the facts, nor apparently did the Sand Company. Not long after the accident the ship sailed for foreign ports, carrying her company with her. Their departure left in this country the employés of the Terminal Company as the only persons who knew the facts. They do not appear to have volunteered any information concerning them. Nothing that the Chemical Company did or left undone caused the Sand Company to change its position for the worse. There is nothing to raise an estoppel.

It follows that the Sand Company must be held solely in fault.