## HASTORF CONTRACTING CO., Inc., v. STANDARD OIL CO. OF NEW JERSEY et al.

(Circuit Court of Appeals, Second Circuit. April 13, 1921.)

No. 193.

Shipping ⊜⇒58(2)—Evidence held not to show capsizing of barge was caused by improper method of loading.

On a libel by the owner of a barge against the charterer, who brought in the stevedore who was loading the barge, evidence *held* not to sustain the libelant's contention that the capsizing of the barge was due to its being loaded in a careless and improper manner, which was contradicted by the disinterested testimony in the case, but to support rather a belief that the capsizing was due to the springing of a sudden leak, as found by the District Judge, who heard the testimony in open court.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the Hastorf Contracting Company, Incorporated, against the Standard Oil Company of New Jersey and T. T. Joret. From a decree dismissing the libel, libelant appeals. Affirmed.

Libelant owns a scow of the kind commonly used in New York waters for carrying crushed stone, sand, gravel, and the like. She is 111 feet over all, with a loading deck of about 85 feet between fore and aft bulkheads 7½ feet high, and is fit to carry 500–550 tons. Libelant hired her by the day to the respondent Oil Company, and the latter sent her in charge of the owner's master to receive a cargo of pyrites from the steamship Werribee.

For this purpose she was laid alongside the steamship and received pyrites from 10 a. m. until the close of working hours, by which time she had aboard (as is agreed) approximately 200 tons. On the following day loading began again at 7 a. m. and continued with the usual intermission for dinner until about 1:20 p. m., when the master (in his own language) "started in to make a terrible holler that the boat was leaking bad and the loaded part going down; that was what made them stop loading." Loading then ceased, and at about 2 o'clock a tug came alongside, put in her suction, and pumped for some time, at first gaining on the water; but the scow finally began to settle to port, whereupon the tug cast off and the scow capsized, dumping her cargo and receiving serious injuries, to recover for which this libel was filed.

The libel declares that the vessel was chartered in good condition and returned in bad, notwithstanding agreement to return in "same condition as when delivered"; wherefore respondent Oil Company is liable. No such agreement was proved. Answer affirmatively asserts that the damage was solely due to the negligence of the scow captain and/or the leaky and unseaworthy condition of the scow.

The Oil Company by petition brought Joret into the case, he being a stevedore employed by the Oil Company to unload the steamship Werribee. This petition and Joret's answer raised the question whether or not the capsizing of the scow (assuming her seaworthiness) was caused by improper loading on the part of Joret and his employees.

The cause was tried in open court, and upwards of 20 witnesses were examined before the trial judge. At the close of evidence the court dismissed the libel, without rendering opinion, and libelant appealed.

Foley & Martin, of New York City (William J. Martin and George V. A. McCloskey, both of New York City, of counsel), for appellant.

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (L. De Grove Potter and Theodore M. Hequembourg, both of New York City, of counsel), for appellee Standard Oil Co.

Before WARD, HOUGH, and MANTON, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). The record discloses no debatable proposition of law; it being admitted that the unexplained leaking or the sudden capsizing of any vessel in quiet waters is evidence from which unseaworthiness may be inferred. Equally is it admitted that a good deck scow may be so loaded with such a cargo as pyrites as to cause strain and consequent leaking, and furthermore it is well known that when any laden deck scow leaks dangerously she is, owing to the height of her center of gravity, very likely to capsize.

Thus the question below and here is only: How did Joret load the scow? Libelant's scow master, with some corroboration, deposed with particularity that the pyrites came out of a chute and were poured (without trimming) upon one portion of the deck until at the close of the first day's work he had nearly 200 tons all in one pile, and a short distance from the stern bulkhead, to all of which he vigorously objected without result. He wanted the scow shifted, so that the chute might dump in different places, but other scows (according to him) were so close; both ahead and astern, that "my boat could not be moved; it was locked." On the second day the same kind of loading began again, and continued with a change of no more than "three or four feet toward the bow" until (as above stated) the captain proclaimed his boat to be leaking dangerously.

It is satisfactorily shown, by comparison of the quantity called for by the Werribee's bills of lading and the weight actually delivered, that the scow capsized with about 330 tons aboard, and this weight (according to the captain) was all aft of amidships and occupied no more than the after 25 feet of deck space. In other words, quite two-thirds of a full load had been deliberately laden on less than one-third of the deck. We are of opinion that such loading was grossly improper, and under the evidence likely, though not certain, to produce strain and consequent leaking. This story is wholly denied by the stevedores, and their denial is aided by the one disinterested eyewitness, an employee of the owner of the pyrites.

We find, and in the absence of opinion infer that the trial judge found, the cargo to have been put aboard the scow, not through a chute, but by means of the usual boom, fall, and tubs. Libelant's scow was not "locked in," so that it could not be shifted, for there were but two vessels taking cargo alongside, and they could have been moved (within limits) together. But the use of the tubs rendered such movement rarely necessary. The stevedores did begin to dump from the tubs at or near the after bulkhead, and deposited in one place approximately 70 tons. They then began to dump further forward, and repeated this operation until they were at work on the fifth dump, and forward of amidships, when the scow master stopped work as above set forth. This method of loading was usual and proper, and under

the evidence would not cause damage to any vessel reasonably fit for such deck cargo as pyrites.

Libelant's scow, although some 20 years old, is shown to have been kept in good condition, and had received a reasonable overhaul only a few months before this accident. Yet it is well known that wooden vessels do at times begin to leak with a suddenness and violence quite difficult of explanation. We have often commented upon the importance of seeing and hearing witnesses, and pointed out our unwillingness to disturb a finding of fact made by the judge, who must have weighed and been moved by the apparent credibility of the men he listened to. In this case libelant's witnesses describe a style of loading not only improper, but foolish and unnecessary. Their testimony was rejected below, as we would have rejected it, had the testimony been taken by deposition and we had been the first to examine it judicially. It is far more difficult to believe the method of loading asserted by libelant than it is to believe the inference of a sudden leak, which is the only explanation consistent with respondent's testimony.

Considering, therefore, that the apparently disinterested evidence favors appellee, the case somewhat resembles The Florida, 256 Fed. 22, 167 C. C. A. 294, and as in that case we affirm the decree appealed from, with costs.