### THE IRVING.

### THE SEATRAIN HAVANA.

### CONNERS MARINE CO., Inc., v. MANHATTAN LIGHTERAGE CORPORATION.

#### Nos. 14128, 14576.

District Court, E. D. New York.
June 23, 1936.

Thomas A. McDonald, of New York City, for Conners Marine Co., Inc.

Carter, Ledyard & Milburn, of New York City (H. H. Ramm, of New York City, of counsel), for American Molasses Co. of New York.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (E. S. Murphy, of New York City, of counsel), for Seatrain Lines, Inc.

Burlingham, Veeder, Clark & Hupper, of New York City (John L. Galey and Stanley R. Wright, both of New York City, of counsel), for Manhattan Lighterage Corporation.

CAMPBELL, District Judge.

On stipulation the two above-entitled suits were consolidated for the purpose of trial only, separate decrees to be entered, and one opinion will suffice.

In the second above-entitled action the Manhattan Lighterage Corporation was on the petition of Seatrain Lines, Inc., impleaded under the 56th Rule in Admiralty (28 U.S.C.A. following section 723); and the lighter Irving and Conners Marine Company, Inc., were on the petition of Manhattan Lighterage Corporation impleaded under the 56th Rule in Admiralty.

At all the times hereinafter mentioned and at the time of the trial Conners Marine Co., Inc., the libelant in the first above-entitled suit, and respondent-impleaded in the second above-entitled suit, was a domestic corporation organized and existing under and by virtue of the laws of the state of New York.

At all the times hereinafter mentioned and at the time of the trial, Manhattan Lighterage Corporation, the respondent in the first above-entitled suit, and a respondent-impleaded in the second above-entitled suit, was a corporation organized and existing under the laws of the state of New York, with an office and place of business at 17 Battery Place, N. Y., and has no place of business or residence within this district and within the jurisdiction of this court, but has certain property consisting of floating equipment, chattels, and goods, and/or various other credits within this District and the jurisdiction of this court.

At all the times hereinafter mentioned and prior to the time of the said chartering of the said lighter Irving to said Manhattan Lighterage Corporation she was owned by the said Conners Marine Co., Inc.

At all the times hereinafter mentioned and at the time of the trial, American Molasses Company of New York, the libelant in the second entitled suit, was a corporation organized and existing under and by virtue of the laws of the state of New York, with an office for the transaction of business at No. 111 Wall street, city of New York.

At all the times hereinafter mentioned and at the time of the trial Seatrain Lines, Inc., the respondent in the second above-entitled suit, was a corporation organized and existing under the laws of the state of Delaware, with an office for the transaction of business at 39 Broadway, city of New York, and was at said times the owner of the steamship Seatrain Havana, and engaged as a common carrier in interstate commerce shipments and transportation by water between, among other places, the state of Louisiana and the state of New York.

During the currency of process hereunder the lighter Irving was within this District and within the jurisdiction of this court.

On the 7th day of December, 1933, the libelant in the first above-entitled suit, Conners Marine Co., Inc., chartered and hired to the respondent in such suit, Manhattan Lighterage Corporation, the lighter Irving at a rate of $12 per day for a period commencing December 8, 1933, and continuing until the lighter was returned to the libelant in the towing limits of New York Harbor, at a place designated by the libelant, in the same condition as when received, less ordinary wear and tear, pursuant to an oral charter agreement, confirmed by the said libelant in writing.

Pursuant to the said charter the libelant aforesaid, Conners Marine Co., Inc., delivered the lighter Irving to the respondent, Manhattan Lighterage Corporation, on the 8th day of December, 1933, and said lighter remained in the care, custody, and under the direction and control of the said respondent from that time until on or about January 3, 1934, when the said lighter was returned by the said respondent, Manhattan Lighterage Corporation to the said libelant, Conners Marine Co., Inc.

When the said lighter Irving was returned by said respondent, Manhattan

24

Lighterage Corporation, to the said libelant, Conners Marine Co., Inc., it was not in the same condition as when received, but was damaged and broken, and that such damage was not the result of ordinary wear and tear.

On the 20th day of December, 1933, the respondent in the second above-entitled suit, Seatrain Lines, Inc., as a common carrier, as hereinbefore described, received from the American Molasses Company of Louisiana, at Belle Chasse, La., 1,958 barrels of molasses in good order and condition and accepted the same for transportation on the steamship Seatrain Havana, and agreed to transport the same, from Belle Chasse, La., to New York, there to be delivered in like good order and condition as when received, to American Molasses Company of New York, the libelant in the second above-entitled suit, to whom said goods were consigned, in consideration of the agreement that the usual freight rates for the transportation of such goods between such places be paid to said respondent, collect upon arrival of the said goods at destination, and the said respondent thereupon issued two bills of lading, one for 1,542 barrels of molasses, and the other for 416 barrels of molasses, in each of which bills of lading the receipt of the goods therein referred to was acknowledged in apparent good order, and the said respondent agreed to carry the same as aforesaid. The said barrels of molasses were thereafter laden on the steamship Seatrain Havana, and the said steamship sailed for the port of New York.

Certain of the aforesaid barrels of molasses were not delivered to the said libelant, American Molasses Company of New York in New York, in the like good order and condition in which the same were received by the said respondent, nor in which they were laden on the steamship Seatrain Havana.

A claim in writing for the said loss and damage to said barrels of molasses was duly filed by the said libelant with the said respondent within nine months after delivery of such part of the said barrels of molasses as were delivered to the said libelant, to wit, on the 16th day of March, 1934.

On July 20, 1933, the said respondent, Seatrain Lines, Inc., and respondent-impleaded, Manhattan Lighterage Corporation, entered into a contract whereby said Manhattan Lighterage Corporation agreed to render the service of lighterage of general and special cargo from the piers of Seatrain Lines, Inc., in New York Harbor to points within the lighterage limits of New York Harbor, and from points within the lighterage limits of New York Harbor to the piers of Seatrain Lines, Inc., in New York Harbor, at certain rates specified therein for general and special cargo.

Pursuant to the provisions of the said contract, Seatrain Lines, Inc., notified Manhattan Lighterage Corporation of the arrival at New York of a shipment of barrels said to contain molasses carried by S. S. Seatrain Havana, from Belle Chasse, La., to New York as aforesaid, and requested Manhattan Lighterage Corporation to perform the lighterage of said cargo from the terminal of Seatrain Lines, Inc., at Hoboken, N. J., to Erie Basin, Brooklyn, N. Y., and there deliver the same to American Molasses Company of New York in accordance with said lighterage contract, and Manhattan Lighterage Corporation undertook to perform the said lighterage and delivery under the terms of said lighterage contract.

On December 28 and 29, 1933, Seatrain Lines, Inc., delivered the said shipment to Manhattan Lighterage Corporation at the pier of Seatrain Lines, Inc., at Hoboken, N. J., and Manhattan Lighterage Corporation received the same and loaded a quantity of said barrels of molasses, all in apparent good order and condition, on the lighter Irving. Thereafter the said lighter Irving proceeded from the terminal of Seatrain Lines, Inc., at Hoboken, N. J., to Erie Basin, Brooklyn, N. Y., but that said barrels of molasses were not delivered to said American Molasses Company of New York, in like apparent good order and condition as when received from Seatrain Lines, Inc.

The letter of November 20, 1931, from said Manhattan Lighterage Corporation to said Conners Marine Co., Inc., did not form part of the charter in question of the lighter Irving of December 8, 1933. The said Conners Marine Co., Inc., had in writing prior to that time refused to accept the limitations of that letter, and the subsequent course of conduct, and the confirmations of many charters between November 20, 1931, and December 8, 1933, clearly show that such letter of November 20, 1931, formed no part of the charter of December 7, 1933.

The lighter Irving was in the repair yard in the spring of 1933, when she was

searched and caulked, and again in October, 1933, less than two months before the charter in question began, she was at the repair yard, and was given an examination by the captain and the carpenter foreman, but at neither of those times was she hauled out on dry dock, but the caulking of the bottom was in good condition even after capsizing.

The lighter Irving had been under charter to Manhattan Lighterage Corporation in October and had no difficulty in carrying her cargoes.

From April, 1933, up to the time of the charter in question the Irving had carried copper, cement, general cargo.

No trouble was caused by the boat leaking.

The first load carried when the Irving went on charter to Manhattan Lighterage Corporation in October, 1933, was cocoa beans, of which she carried 6,400 bags, then a load of raw sugar.

Then the Irving carried for Conners, and not the Manhattan Lighterage Corporation, a load of cement, then a load of burlap, and then cement.

Just before the Irving was picked up at Dock 10, Central Railroad, to go on the charter in question she had come back from Harrison, N. J., with a load of cement. The only examination of the Irving before going under charter of December 7, 1933, was that made by Mr. Conners, and it does not seem to me that it was complete enough to have discovered leaks. After being picked up at Dock 10, Central Railroad, the Irving was towed to Pier 2, Erie Basin, to load staves which she loaded to the extent of 400 to 450 tons, and her captain says had a freeboard of two feet or a little more or a little less amidships. That cargo, which was loaded to a height of 15 to 25 feet, the Irving carried from December 8 to December 27, 1933, without incident, while she lay idle at Pier No. 2, Erie Basin, and was unloaded by the charterer's employees. She was not shown to be leaking and no criticism of the vessel was made. There was no evidence offered by any officer, agent, or employee of the respondent, Manhattan Lighterage Corporation, who were aboard the vessel during the loading or unloading of the stavings, or the loading of the barrels of molasses, that the vessel was leaking at any time. To show unseaworthiness of the Irving, at the time of the commencement of the charter in question, the respondent relies upon the opinion evidence of four expert witnesses who base their opinions on what they observed, three of them when the boat was on dry dock, and all four when she was in the water after she had capsized. They found that the boat had not been properly maintained, that her seams were leaking in a number of places, and that there were breaks and checks in the planks through which the water had plainly entered, that one starboard side plank had been broken (an old break) and pushed in seven-eighths of an inch, and a leak had also occurred at this point. The inside of the boat bore several patches, and on January 2, 1934, when the surveyors examined the boat, signs of leakage were found in all these places. The weather had been extremely cold and the surveyors said the leaks inside the boat were evidenced not only by stains, but by ice at the cracks and openings leading all the way down. There is no substantial contradiction of their testimony.

After the Irving had discharged her cargo of staves, and on the morning of December 28, 1933, at the Seatrain terminal at Hoboken, the charterer began loading the Irving with molasses, which loading was completed on the afternoon of December 29, 1934. The captain of the Irving attended to the hoister, and Nelse Pettersen, an employee of Manhattan Lighterage Corporation, was in charge of the loading with four men to help him. After a short time Nelse Pettersen left, and Charles John Petersen, another employee of Manhattan Lighterage Corporation, took charge of the loading and stowed the cargo himself, the two men who had been assisting Nelse Pettersen on the boat having been taken off. The captain of the Irving during all of the loading attended to the hoister.

On the trial the captain of the Irving made complaint about the stowage of the cargo, but, although he was present during all of the stowage of the cargo, he made no complaint about it and was evidently satisfied with it, because, if he is to be believed, he remained aboard the boat.

About 12:50 a. m. on December 30, 1933, the Irving was picked up, and on the same morning she was placed in the long slip at Erie Basin, outside a coal boat, and later shifted by her captain further up the slip to within about 75 feet of the bulkhead, where she was made fast on the east side of the slip, with her port side to the pier. She lay in that same position all day Satur-

day and appeared to be in no difficulty. The captain of the Irving placed covers over her cargo on Saturday December 30th about 10 o'clock a. m., which was the last time the captain was seen by any one, who testified on the trial, until after the Irving capsized. If, however, the captain of the Irving be believed, he remained aboard all day of the 30th and slept aboard Saturday night. During all of this time he made no complaint about the stowage of the cargo. The captain of the Irving says, that he left the boat on Sunday morning December 31st about a quarter or twenty minutes after 6 o'clock to obtain some groceries, and did not come back until half past 7 or 8 o'clock. He says that he did not pump his boat on Saturday or Sunday, but in an affidavit, which he made at an earlier date, he said he pumped his boat on Saturday morning. He says he observed on Saturday that his boat had a slight list to port, and that the list was greater on Sunday morning, and before he left the boat, he went through it, but found no water. About 6:30 o'clock a. m. Sunday December 31st, the captain of another boat of the Manhattan Lighterage Corporation lying on the other side of the slip observed the list of the Irving and says he went and looked down the small hatches and could not see the water, but could hear it as it came in. He tried to secure the services of a tug to pump out the Irving, but without success, and called up Pettersen, the runner for the Manhattan Lighterage Corporation, who arrived at about half past 7 o'clock a. m. Pettersen says he looked down in the hold and there was a lot of water in there; he broke open the cabin, which was locked, and released a police dog, and tried to get a hammer and nails to nail down the hatches, but before he could succeed he saw the Irving had gone too far. Shortly afterward the load went off on the port side of the lighter very quickly, all of the barrels, except a few which remained in the square hatch, being dumped. Both Guldbransen and Pettersen said they noticed no disarrangement in the load, or shifting of cargo, up to the time the boat lost her cargo. The Irving and her cargo were damaged, and the Irving was shoved across the slip by the dumping, and later made fast on the other side starboard side to the pier by Pettersen and Guldbransen. When the tug arrived that Pettersen summoned, and began pumping there was at least two feet and a half of water in the bottom of the Irving, and one witness says four feet. In addition to the surveyors called on behalf of Manhattan Lighterage Corporation, the Irving was also surveyed, between December 31st and January 12th, by Mr. Bagger, as surveyor for Conners Marine Co., Inc. Mr. Bagger was not produced as a witness on the trial, nor was the excuse given for his nonproduction adequate.

The so-called survey offered on behalf of Conners Marine Co., Inc., is not binding on any of the parties to either suit, but merely represents the testimony of Mr. Conners as to what damage he found.

The principal issue here is whether the Irving was seaworthy when delivered under the charter. In the first above-entitled suit, the burden of showing that she was, and that the charterer was negligent, both rest on the owner. The Cullen No. 32 (C.C.A.) 62 F.(2d) 68, affirmed Cullen Fuel Co. v. W. E. Hedger, Inc., 290 U.S. 82, 54 S.Ct. 10, 78 L.Ed. 189; Taylor Bros. Lumber Co., Inc., v. Sunset Lighterage Company (C.C.A.) 43 F.(2d) 700; Hildebrandt v. Flower Lighterage Co. (D.C.) 277 F. 436, affirmed (C.C.A.) 277 F. 438; Shamrock Towing Co., Inc., v. City of New York (C.C.A.) 32 F.(2d) 684. In the second above-entitled suit the burden rested upon Conners Marine Co., Inc., the owner, to show the negligence of the charterer. Taylor Bros. Lumber Co. v. Sunset Lighterage Company supra. On all the evidence it does not seem to me that there is any presumption that the charterer was negligent, which arose from the redelivery of the lighter Irving by the charterer to the owner in a damaged condition, as I am not convinced that she was delivered to the charterer in a seaworthy condition.

The place of the accident was a protected and sheltered berth in a quiet slip, it occurred on a quiet day without any stress of weather, and without the movement of any other boats in the slip, and this creates a presumption of unseaworthiness. The Emergency (D.C.) 9 F.Supp. 484; The Kathryn B. Guinan (C.C.A.) 176 F. 301; Dupont de Nemours v. Vance, 19 How. 162, 15 L.Ed. 584.

From the testimony of Guldbransen that he could hear water coming into the Irving before she careened and dumped her cargo, unless improper loading was shown, the inference is that the Irving was unseaworthy. The Cary Brick Co. No. 8 (D.C.) 34 F.(2d) 981. No damage of any kind had been suffered by the Irving from

the time she went on charter until the time she dumped her load, and the boat, when examined, after the accident, did not disclose any evidence of any other accident or contact. The testimony of the surveyors is convincing that the Irving was unseaworthy and that the defects they found were sufficient to account for the accident, and this is not overcome by the testimony of Mr. Conners, that all the defects were due to strain, as there was no evidence of strain in the timbers and fastenings. The failure of Conners Marine Co., Inc., to call Mr. Bagger, a surveyor who examined the boat for it, at least weakens the claim of seaworthiness made by Mr. Conners. I saw and heard the captain of the Irving, who was called as a witness, and I believe he was in error in the testimony which he gave on the trial, as to not pumping on Saturday. If, as the captain of the Irving, says, the boat was improperly loaded and that he did not pump her, but the boat developed a list on Saturday, which was greater on Sunday before he left the boat, and that he examined and found no water, it is hard to understand why, if he was present on the boat during all that time, he did not call the attention of the owner or the Manhattan Lighterage Corporation to its condition.

■ The fact that the Irving was in use without accident prior to the dumping of the molasses does not prove that she was seaworthy. Taylor Bros. Lumber Co. v. Sunset Lighterage Co., supra, 43 F.(2d) 700, at page 702; The Cullen No. 32, supra, 62 F.(2d) 68, at page 70; Penn Builders & Supply Co. v. Braeburn Steel Co. (C. C.A.) 274 F. 794; The Emergency, supra; The Cary Brick Co., supra.

■ The Irving was not loaded beyond what the owner considered her capacity, but the strain of the heavy load of molasses may well have increased the leaking at the places pointed out by the surveyors, but assuming, and not finding, that the captain of the Irving, who was seen returning and not in his working clothes after the boat had dumped her cargo, told the truth as to his presence on the boat Saturday, day and night, and Sunday morning and saw no water in the boat when he left on Sunday morning, that would not prove that the boat was seaworthy, as she might well have sprung a leak without any warning on the morning of December 31st, and still have been unseaworthy. The Kathryn B. Guinan, supra; Hastorf Contracting Co., Inc.,

v. Standard Oil Co. of New Jersey (C.C. A.) 272 F. 884.

The evidence does not show that the Irving had carried any cargoes of a weight equal to that of the molasses cargo in question for months before then, and the only other cargo carried under the charter in question was of about 100 tons lighter than the molasses.

The stresses imposed on the boat by the molasses cargo were quite different due to it being more concentrated.

The evidence of the surveyors, and the evidence on behalf of the owner as to repairs made shows that the Irving had not been properly maintained previous to delivery under the charter in question.

■ I accept as true the testimony of Charles J. Petersen as to the manner in which the cargo was loaded, and am convinced that Captain Hendrickson was in error, as his conduct did not square with the story he told. He says the boat was on an even keel when the loading was completed. He admitted familiarity with the manner of loading barrels, and that he continued operating his hoister and putting barrels on the loading after he knew of the alleged defects in the lower tiers. He spent from 10 o'clock a. m. to 4 o'clock p. m. on Saturday December 30th in putting covers on his cargo, but observed no shifting or displacement of the cargo. He says that he did not regard the defects, he says he observed, as dangerous, and he did not complain or notify anyone about them. If the story told by the captain of the Irving is true as to listing on Saturday and Sunday when the Irving had no water in her, then his failure to notify the owner of the boat and take measures to relieve the situation, instead of going away on Sunday morning, and leaving her to dump her cargo, constituted negligence for which the owner would be liable. Dittmar v. Sargent (C.C. A.) 377 F. 237; The Cary Brick Co., supra; The On-The-Level (D.C.) 128 F. 511.

The evidence does not satisfy me that even if the defects in loading, described by Captain Hendrickson, existed, which I do not believe did exist, they would have caused the listing of the boat and the dumping of her cargo under the conditions then prevailing, nor was there any expert testimony to the effect that such could have been the cause. The boat, after loading, had been towed on a hawser across New York Harbor without incident and had been lying for a day and a half in a quiet

28

slip, and dumped her cargo only on one side, and, further, the evidence showed a gradually increasing list on Sunday morning prior to the dumping of the cargo, all of which tend to negative the idea of improper loading, and to show that leakage caused the dumping of the cargo.

No one saw any molasses dripping from the boat, either on Sunday or any other time, and on no day while the molasses was on board was the temperature higher than 19 degrees above zero, which is well below the freezing point; therefore, it seems clear to me that the dumping of the cargo of the Irving could not have been occasioned by the leakage of molasses from some of the barrels.

The lighter Irving was unseaworthy when she went on the charter in question, and was unseaworthy when she dumped her cargo.

■ The rule of caveat emptor, claimed to apply on the behalf of Conners Marine Co., Inc., has no application to the instant suits. The charterer knew nothing about the boat, did not designate the boat, but accepted the boat furnished by the owner as filling the qualifications designated, and relied on the warranty of seaworthiness, and made no inspection, nor was it requested to make any, and the defects complained of were only discoverable by an examination of the interior of the boat, and even then, without knowledge of the pumping required when loaded, might not have been discoverable when the boat was light. The charterer had the right to rely on the warranty of seaworthiness and was not bound to make an inspection. The Presque Isle (D.C.) 140 F. 202; Dempsey v. Downing (C.C.A.) 11 F.(2d) 15; Work v. Leathers, 97 U.S. 379, 24 L.Ed. 1012; Church Cooperage Co. v. Pinkney (C.C.A.) 170 F. 266; The Lizzie W. Virden (C.C.) 11 F. 903, 910. Patton-Tully Transp. Co. v. Barrett (C.C.A.) 37 F.(2d) 516; The Jungshoved (D.C.) 272 F. 122; Naylor & Co. v. Terminal Shipping Co. (D.C.) 237 F. 725, 727. The cases cited on behalf of the owner have been examined, but on the facts are clearly distinguishable from the instant suit.

In the first above-entitled suit, the respondent Manhattan Lighterage Corporation was without fault or blame, and a decree may be entered in its favor against the libelant Conners Marine Co., Inc., dismissing the libel with costs.

■ In the second above-entitled suit the lighter Irving and respondent-impleaded Conners Marine Co., Inc., are primarily liable by reason, of the unseaworthiness of the Irving, and Manhattan Lighterage Corporation and Seatrain Lines, Inc., are secondarily liable under their contracts of carriage and bills of lading respectively, and a decree may be entered in favor of the libelant, American Molasses Company of New York, against the lighter Irving and Conners Marine Co., Inc., respondent-impleaded, as primarily liable and against respondent-impleaded Manhattan Lighterage Corporation, and respondent-impleaded Seatrain Lines, Inc., as secondarily liable.

Settle decrees on notice.

If this opinion is not considered a sufficient compliance with Admiralty Rule 46½ (28 U.S.C.A. following section 723), submit proposed findings of fact and conclusions of law in accordance with this opinion for the assistance of the court, as provided by the Admiralty Rules of this court.