Burton S. Sherman, J.
In this nonjury action the plaintiff, Luria Brothers (Luria) seeks to recover the balance of the purchase price of scrap metal sold to the defendant, Associated Metal & Minerals Corporation (Associated). Associated counterclaimed, alleging that the balance of the metal was lost as a result of the plaintiff’s failure to furnish a seaworthy barge for delivery. Associated also impleaded the harge owner, Lehigh Marine Disposal Corp. (Lehigh), and M. J. Eudolph Corporation (Eudolph), a crane operator, seeking indemnity and salvage costs, claiming that the loss of the metal was the result of the unseaworthiness and negligence of Lehigh’s barge and/or the negligence of Eudolph. Lehigh counterclaimed in the impleader action for the loss of the barge, claiming negligence by Associated, and cross-claimed against Eudolph for the loss of the barge for negligence.
Preliminarily, Eudolph’s motion to dismiss the third-party action against it on the grounds of improper joinder of parties was denied by the court on the authority of CPLE 1007. However, no evidence being furnished to show any liability on the part of Eudolph, the third-party complaint and the cross claim are dismissed as to Eudolph, and Eudolph may have judgment thereon, with the cost of this action against Associated and Lehigh.
The undisputed facts are that on February 27, 1970, Luria as seller and Associated as buyer entered into a contract for the sale of scrap metal, delivery to be made “ FAS Steamer your berth Port Elizabeth, New Jersey.” Luria had a shipping contract with Lehigh and, pursuant to oral request, Lehigh as owner furnished a wooden barge No. 280 at Luria’s yard in Brooklyn to deliver the scrap metal. The barge arrived at the yard on April 4,1970, and, I find, was properly loaded with the cargo of scrap metal. On April 7, the barge in good trim was towed by Lehigh to its facilities on Staten Island. On April 8, 1970, a preliminary marine survey was made, showing the cargo to be 563.9347 gross tons of No. 1 HMS. The surveyor at that time found the wooden barge to be dry and in good con *939 dition. It remained at Staten Island for further shipping orders. On April 22, 1970, the barge, in response to instructions from Luria, was again towed by Lehigh, arriving at Associated’s Berth No. 59 at Port Elizabeth, New Jersey, in the early morning of April 24, 1970, to await the arrival of the steamship Oceamc Peace. This vessel, which was to receive the scrap metal, arrived at Associated’s Pier 63 on April 24, 1970. On Saturday, April 25, 1970, the barge was shifted by Associated from Berth No. 59 to a position alongside of Rudolph’s crane at the steamship. The loading of the steamship was to have taken place on Monday, April 27,1970.
The barge was seen afloat by an employee of Associated on Saturday, April 25, 1970. Two bargemen, employed by Lehigh to inspect the barge, stated that they did so on Sunday, April 26, 1970 at about 1:30 p.m. and found it to be dry and in good trim. On Monday morning, April 27, 1970, at approximately 7:30 a.m., before the unloading was to have taken place, the barge was found to have capsized and her cargo of scrap metal dumped into the water.
The weather was good, the water calm, and there was no shipping activity at the location of' the barge on Sunday, April 26, 1970. Associated notified Lehigh that the barge had capsized, but Lehigh made no effort to retrieve it although it was still afloat. Because there was no joint survey, there is no direct evidence as to how the accident happened. Nor were there any eyewitnesses. The barge was eventually removed by the Army Corps of Engineers as a hazard to navigation and destroyed.
As to the main action, the contract provided for delivery “ FAS Steamer your berth Port Elizabeth, New Jersey,” Delivery was made according to these terms. The barge was at Associated’s berth at least three days before it capsized and at least two days alongside the steamship. Oceamc Peace. Title to the scrap metal passed to Associated. (Uniform Commercial Code, § 2-509, .subd. [1], par. [b]; § 2-319, subd. [2], par. [a]; cf. Pana Pets, Inc., v. Lady Rose Stores, 65 Misc 2d 697; Minex v. International Trading Co. of Va., 303 F. Supp. 205; Madiernse Do Brosil SA v. Stulman-Emrick Lbr. Co., 147 F. 2d 399; 10 Williston, Contracts [3d ed.], § 1080A, p. 112.) Nor was there any evidence of negligence on the part of Luria in the selection of Lehigh as a carrier or evidence of improper loading of the cargo. Accordingly the plaintiff Luria may have judgment against Associated in the amount of $9,686.73, with interest thereon from the 12th day of May 1970, and the counterclaim by Associated against Luria is dismissed.
*940 As to the third-party action, since it involves an alleged maritime tort, Federal law applies (Riley v. Agwilines, 296 N. Y. 402). Lehigh as owner of the barge was under an absolute warranty to furnish a seaworthy vessel. Nor is this duty discharged because the defects are latent. (The Caledonia, 157 U. S. 124; Work v. Leathers, 97 U. S. 379.) Moreover, pursuant to the contract of affreightment with Luria, Lehigh .as bailee of the cargo was also under a duty to exercise reasonable care. (The C. R. Sheffer, 249 F. 600.) On the other hand, Associated at the time of the loss was not only a consignee of the cargo but a bailee of the barge and under a duty to exercise reasonable care to protect it until the owner recovered possession, (Harms Co. v. Erie R. R. Co., 167 F. 2d 562, 563.) The fact that each side in this case claims a breach of bailment by the other does not present any unusual conflict. For the burden of each party as a bailee to rebut the initial presumption of negligence or breach of warranty of seaworthiness may also serve to strengthen its own position, as bailor, that the bailed article was delivered in good condition. (Richmond Sand & Gravel Corp. v. Tidewater Constr. Corp., 170 F. 2d 392, 394; The Irving, 16 F. Supp. 22, affd. sub nom. Conners Marine Co. v. Manhattan Lighterage Co., 91 F. 2d 1011.) However, despite the duty to explain the loss, each party still has the burden to prove its claim by a fair preponderance of the credible evidence. (Commercial Corp. v. New York Barge Corp., 314 U. S. 104.)
The evidence was that the barge when last seen was moored beside the Rudolph crane, which in turn was next to the Oceanic Peace at Berth 63 at Port Elizabeth, New Jersey. The weather was good. There was no movement of boats or harbor activity at the slip on Sunday, April 26, 1970. The berth was sheltered and free from the hazards of the high seas. The barge was carrying less than full capacity. The unexplained capsizing of a barge in calm waters at a sheltered berth with no activity clearly creates a presumption of unseaworthiness. (The Jungshoved, 290 F. 733, cert. den. 263 U. S. 707; Hickman, Williams & Co. v. Murray Trans. Co., 31 F. Supp. 820; United States Metals Refining v. Jacobus, 205 F. 896; Matter of Peterson Lighterage & Towing Corp., 154 F. Supp. 461, affd. 253 F. 2d 952; Commercial Corp. v. New York Barge Corp., 314 U. S. 104, supra.) As stated in The Boyle (105 F. 2d 113, 114), “ Boats are built to float.”
There was also affirmative evidence to support the presumption of unseaworthiness. The barge was a wooden deck scow built in 1928 or 1930. It had previously been owned by the New York Trap Rock Corp. and used for carrying sand. It was pur *941 chased by Lehigh in early 1968. While a report by a marine surveyor in December, 1968 stated that the barge had been pnt in good condition, this survey was made for insurance purposes and has little probative value. Moreover, the same surveyor testifying as an expert at the trial stated that a wooden barge should normally be drydocked and caulked every three to five years. The president of Lehigh admitted that the barge had never been drydocked during the time of its ownership. It also occasionally required pumping because of leakage. While this was said not to be unusual, the fact remains that it required pumping three days before it capsized.
All this supports the conclusion that the barge was unseaworthy. (O’Brien Bros. v. Moran Towing Corp., 66 F. Supp. 614.) Nor does the fact that the barge was in use without prior accident overcome the presumption of unseaworthiness (The Irving, 16 F. Supp. 22, 27, supra). A further inference of unseaworthiness is also drawn from the fact that Lehigh after the accident abandoned its barge. Lehigh’s failure to conduct a joint survey must be viewed with suspicion. Its conduct not only fails to overcome the presumption of unseaworthiness, but also supports it. (The Westchester, 254 F. 576; Shepard S. S. Co. v. United States, 111 F. 2d 110,113.)
There was also a total lack of proof of negligence on the part of Associated. The bargemen testified that, when they last saw the barge on Sunday afternoon, it appeared to be properly, secured and free from at least obvious damage. There was also no showing that Associated was negligent in retaining the Thomas Towing Company to move the barge from Berth No. 59 to. No. 63. Nor was the towing negligently done. As pointed out in Richard Sand & Gravel Corp. v. Tidewater Constr. Corp. (170 F. 2d 392, 394, supra), “ The bailee’s position is further strengthened in cases such as this where the damage to the bailed article is such as might have resulted from a latent defect in the article itself rather thán from the application of outside forces. In this situation, the bailee’s proof that he exercised due care in all that he did with respect to the bailed article not only serves to rebut the presumption of negligence on his part but also tends to destroy the bailor’s initial proof that the article was delivered in good condition. ’ ’ (Also, see, The Irving, 16 F. Supp. 22, supra.)
I also find that Lehigh was negligent in failing to make a proper inspection of the barge on Sunday, April 26,1970. There is no question but that Lehigh assumed this duty pursuant to its contract with Luria. There was also expert testimony that the *942 barge should have been inspected twice a day. There was only one inspection oh the Sunday in question.
I conclude that the failure of a proper inspection, if it was indeed made at all, was a cause of the barge to capsize. (Dailey v. Carroll, 248 F. 466, 468; The Southwark, 191 U. S. 1.)
In conclusion, I find that the barge was unseaworthy on April 4, 1970, and continued to be so up to and including the time it capsized. I find that the third-party defendant, Lehigh, breached its warranty of1 seaworthiness, which extended to the third-party plaintiff, Associated. I find that the unseaworthiness of., the barge was the cause of the loss of the cargo. I further find that Lehigh failed to exercise reasonable care in the inspecting of the barge, and this was also a cause of the loss of the cargo, I find that the third-party plaintiff, Associated, did not breach its duty of ordinary care to protect the barge. I find that the third-party plaintiff, Associated, sustained its burden of proof in the third-party action, and the third-party defendant, Lehigh, did not sustain its burden on its cross claim. I find that the third-party defendant, Lehigh, has not sustained its affirmative defense to limit liability pursuant to subdivision (a) of section 183 of title 46 of the United States Code (Grace & Co. v. Charleston Lighterage & Transfer Co., 193 F. 2d 539; Cullen Fuel Co. v. W. E. Hedger, Inc., 290 U. S. 82).
Accordingly the third-party plaintiff, Associated, is awarded judgment over as against the third-party defendant Lehigh in the sum of $9,686.73, with interest from May 12, 1970, and the cross claim by the third-party defendant Lehigh against the third-party plaintiff is dismissed, and Associated may enter judgment thereon.