In re CRYSEN/MONTENAY
ENERGY CO., Debtor.

CRYSEN/MONTENAY ENERGY
CO., Appellant,

v.

ESSELEN ASSOCIATES,
INC., Appellee.

No. 788, Docket 89–5035.

United States Court of Appeals,
Second Circuit.

Argued Feb. 2, 1990.

Decided May 9, 1990.

Richard N. Chassin, New York City (John R. Horan, Fox & Horan, New York City, of counsel), for appellant.

Anthony J. Pruzinsky, Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, New York City, for appellee.

Before OAKES, Chief Judge,
KEARSE, Circuit Judge, and
FLETCHER, Circuit Judge.*

OAKES, Chief Judge:

Crysen/Montenay Energy Co. ("Crysen") appeals an August 10, 1989, amended opinion and order of the United States District Court for the Southern District of New York, Milton Pollack, Judge, reported at 102 B.R. 25 (S.D.N.Y.1989), holding that prosecution of a tort claim by appellee Esselen Associates, Inc. ("Esselen"), against Consolidated Edison Company of New York, Inc. ("Con Edison"), is not barred by the automatic stay provision of 11 U.S.C. § 362(a) (1988), on grounds that the claim is not property of Crysen's bankruptcy estate, and reversing the bankruptcy court's award of damages to Crysen's estate for Esselen's willful violation of the automatic stay. Because we agree with the bankruptcy court in concluding that any cause of action Esselen may have against Con Edison is the exclusive property of Crysen's estate, we reverse the portion of the district court's opinion that lifted the injunction imposed by the bankruptcy court against Esselen's prosecution of the claim. Nevertheless, we affirm the district court's refusal to award damages to Crysen, on grounds that the standard governing an award of sanctions for an automatic stay violation was not sufficiently settled in this circuit at the time Esselen initiated its action to justify an award against Esselen.

This case addresses whether a tort cause of action arising out of events that occurred prior to a debtor's declaration of bankruptcy constitutes property of the debtor's bankruptcy estate. In 1985, appellant Crysen, now the debtor, entered into a long-term contract with Con Edison to supply Con Edison with a specified amount of fuel oil over the period November 1985 to March 1987. The contract provided that an independent inspector would determine the quantity of fuel oil delivered in a given shipment by gauging the amount of oil received in Con Edison's shore tanks. In the event the shore tank measurements were unavailable, the contract provided for gauging according to vessel discharge figures.

On January 16, 1986, Crysen also entered into a contract with appellee Esselen for the sale of fuel oil by Esselen. The contract specified that delivery was to be made "into buyer's designated New York harbor terminal" and that buyer's shore tank measurements, as gauged by an independent inspector, would determine the quantity deemed delivered.

Using the purchase of fuel oil from Esselen to fulfill its continuing supply obligations under the Con Edison contract, Crysen designated Con Edison's Hudson Avenue terminal in New York harbor as

* Of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

the place for delivery of Esselen's fuel oil. Under this arrangement, Crysen would make either a profit or loss based on the difference between the price it purchased the oil from Esselen and the price it sold the oil to Con Edison.

On January 22–23, 1986, Esselen's designated vessel discharged, according to the appointed independent inspector, 113,255.93 barrels of oil at Con Edison's terminal. However, the independent inspector found that only 99,719.02 barrels were received into Con Edison's shore tanks, a discrepancy that equated to over $300,000 in "lost" oil.

Despite the inspector's recommendation that the parties amend their various agreements and adopt the vessel discharge figures as more representative than the shore tank measurements of the quantity of oil actually delivered, both Con Edison and Crysen denied receipt of the "missing oil," refused to accept the vessel discharge figure as the quantity delivered, and declined to pay for the 13,537 barrel difference between the vessel discharge figure and the shore tank measurement. Accordingly, Con Edison paid Crysen the price for only 99,719.02 barrels, citing its contract with Crysen which provided that shore tank measurements, when available, would determine the quantity of oil delivered, and Crysen in turn paid the same to Esselen, citing the similar provision in its agreement with Esselen.

On February 19, 1986, Esselen initiated a contract action against Crysen in the United States District Court for the District of New Jersey, demanding payment for the full 113,255.93 barrels allegedly delivered. Crysen impleaded Con Edison into the action, claiming a right to indemnification for any resulting judgment that might hold Crysen liable to Esselen for the "missing barrels." While the action was still pending, however, Crysen in June 1986 filed a petition for reorganization under Chapter 11 of Title 11 of the United States Code. Shortly thereafter, in light of the automatic stay provision governing attempts to collect judgments from estates in bankruptcy, *see* 11 U.S.C. § 362(a), Esselen voluntarily dismissed its action against Crysen, and Crysen withdrew its third-party action against Con Edison.

In January 1987, Esselen filed a tort action directly against Con Edison in the United States District Court for the Eastern District of New York, claiming that Con Edison, by converting or misappropriating the "missing barrels," wrongfully deprived Esselen of its right to payment from Crysen for that oil. Underlying Esselen's action against Con Edison was the theory that the missing barrels of oil had somehow disappeared after discharge from Esselen's vessel and within Con Edison's harbor system.

One year later, Crysen commenced its own adversary proceeding against Con Edison in the United States Bankruptcy Court for the Southern District of New York, seeking payment of the balance due for the 113,255.93 barrels delivered to Con Edison. Moreover, in January 1989, Crysen, claiming that the right to recover from Con Edison was property of its estate, moved to enforce the automatic stay provision of 11 U.S.C. § 362(a) to enjoin Esselen from pursuing the Eastern District action and to assess damages against Esselen for its willful violation of the automatic stay provision. The bankruptcy court granted Crysen's motion. Esselen filed a timely notice of appeal to the district court, which in turn reversed the bankruptcy court's order on grounds that Esselen bore the actual risk of loss for the missing barrels, and thus that its right of action against Con Edison was not the exclusive property of Crysen's bankruptcy estate, pursuant to N.Y.U.C.C. Law § 2–722 (McKinney 1964). Crysen appeals the reversal by the district court of the bankruptcy court's order.

## DISCUSSION

Contrary to Crysen's arguments, we do not agree that this case, as a matter of law, necessarily involves only a simple contractual dispute as to the proper measure of delivered oil. Because of the large discrepancy between the vessel discharge figure and the shore tank measurement, it is possible that Esselen, through further dis-

covery, can demonstrate that the "missing oil" was in fact misappropriated or somehow diverted, as by pipes between storage tanks, and not simply measured incorrectly.

■ Given that facts may support a tort cause of action against Con Edison, the issue remains whether this cause of action is the exclusive property of Crysen's bankruptcy estate. If so, then Esselen's prosecution of the action against Con Edison is a violation of the automatic stay provision of 11 U.S.C. § 362(a). The automatic stay prevents individual creditors from suing to enforce a right of action belonging to a corporation when that corporation is in bankruptcy. *See In re MortgageAmerica Corp.*, 714 F.2d 1266, 1276–78 (5th Cir. 1983). If, however, the right of action belongs to the creditor, the action is not part of the debtor's estate and the stay does not apply. *See Kommanditselskab Supertrans v. O.C.C. Shipping, Inc.*, 79 B.R. 534, 540 (S.D.N.Y.1987).

■ The federal bankruptcy code broadly defines property of a debtor's estate as including "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (1988). Within this definition of a debtor's property fall the debtor's rights of action to collect accounts receivable. *See In re Chateaugay Corp.*, 78 B.R. 713, 725 (Bankr.S.D.N.Y.1987); *cf. Mitchell Excavators, Inc. v. Mitchell*, 734 F.2d 129, 131 (2nd Cir.1984) (bankruptcy estate includes debtor's causes of action).

■ Although federal bankruptcy law determines the outer boundary of what may constitute property of the estate, state law determines the "nature of a debtor's interest" in a given item. *In re Howard's Appliance Corp.*, 874 F.2d 88, 93 (2nd Cir. 1989). Therefore, whereas federal law instructs us that the action for the missing oil *may* constitute property of Crysen's estate, state law determines whether Crysen's interest in the cause of action is sufficient to confer on the estate a property right in the action.

## 1. Applicability of the Automatic Stay

Determining whether the tort action against Con Edison is the exclusive property of Crysen's estate requires a parsing out of the relative rights and interests of Esselen and Crysen in the missing oil. Under section 2–722 of New York's Uniform Commercial Code ("UCC"), either party to a contract may bring an action against a third-party tortfeasor who "so deals with goods which have been identified to a contract for sale as to cause actionable injury to a party to that contract," such as by misappropriating the goods, if the party has either title, a security interest, or an insurable interest in the goods, or maintains risk of loss with respect to the goods. N.Y.U.C.C. Law § 2–722(a); *see also* 3 W. Hawkland, *UCC Commercial Code Series* § 2–722:01, at 467 (1982). A party to a contract may also maintain an action against a tortfeasor if, despite the contractual or legal allocation of risk of loss, it "has since the injury assumed [the risk of loss] as against the other." N.Y.U.C.C. Law § 2–722(a). Therefore, if Esselen has either title, a security interest, an insurable interest, or risk of loss with regard to the allegedly missing oil, the tort action against Con Edison is not the exclusive property of Crysen's estate, and the automatic stay does not bar Esselen from prosecuting its Eastern District action against Con Edison. We examine the possible existence of each of these five property interests in turn.

### A. Title

Section 2–401 of the UCC governs the determination of when title passes from seller to buyer. The section provides that "[u]nless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods," N.Y.U.C.C. Law § 2–401(2) (McKinney 1964), and that "if the contract requires delivery at destination, title passes on tender there." *Id.* § 2–401(2)(b).

The agreement between Esselen and Crysen provided that the type of sale was a "delivered" one, and specified that delivery

was to be made "into buyer's designated New York harbor terminal." It is undisputed that, in accordance with its contractual obligations, Esselen delivered the fuel oil to the designated site, the Hudson Avenue terminal, and tendered its goods to Crysen. Included among this tendered oil was the allegedly missing oil, which could only have been misappropriated (if at all) after the vessel had discharged its oil at the terminal. Because the "missing oil" was allegedly delivered and tendered for sale, title to the missing oil had already passed from Esselen to Crysen by the time of the alleged tort.[1] See *Pacific Iron Works v. Long Island R.R.*, 62 N.Y. 272 (1875) (where a seller contracted to ship goods by boat and deliver the goods on board the boat at the buyer's residence, title to the goods passed to the buyer when the goods arrived at his residence on board the vessel, regardless whether the buyer called for and received the goods); *Luria Bros. & Co. v. Associated Metals & Minerals Corp.*, 73 Misc.2d 937, 938–39, 343 N.Y. S.2d 152, 155–56 (N.Y.Civ.Ct.1972) (where contract required delivery by steamer to buyer's berth, title passed when barge reached berth and goods were available for unloading). Accordingly, Esselen did not have title to the oil when the alleged tort occurred.

### B. *Security Interest*

Creation of a security interest in goods requires explicit conformity with the applicable provisions of Article 9 of the UCC. *See generally* N.Y.U.C.C. Law §§ 9–101 to –507 (McKinney 1964 & Supp.1990). Because no explicit agreement designating Esselen as a security holder in the goods was executed, Esselen may not now claim to retain such an interest in the delivered goods.

### C. *Insurable or Special Property Interest*

Under section 2–501 of the UCC, a buyer obtains a special property or insurable interest in goods as soon as the goods are identified for sale under the contract, and a "seller retains an insurable interest in goods so long as title to or any security interest in the goods remains in him." N.Y.U.C.C. Law § 2–501(1)(a), (2) (McKinney 1964). Accordingly, Crysen obtained an interest in the missing oil as soon as the barrels for shipment were designated, and Esselen lost its special property interest as soon as delivery of the goods took place and title passed to Crysen. *See* 1 R. Alderman, *A Transactional Guide to the Uniform Commercial Code* § 1.45–30, at 195 (2d ed. 1983) ("The seller's insurable interest in goods usually ends with their delivery to the buyer, for risk of loss passes to the buyer no later than the time of delivery.").

### D. *Risk of Loss Under the UCC*

Esselen moreover did not maintain the risk of loss for the oil once delivery was made to the Hudson Avenue terminal. According to the UCC,

> Where the contract requires or authorizes the seller to ship the goods by carrier ... if it does require him to deliver them at a particular destination and the goods are there duly tendered while in the possession of the carrier, the risk of loss passes to the buyer when the goods are there duly so tendered as to enable the buyer to take delivery.

N.Y.U.C.C. Law § 2–509(1)(b) (McKinney 1964). Once the seller has fulfilled its obligation to deliver at a particular place, the risk of loss passes even though the buyer may refuse to accept delivery of the goods. *See* 1 R. Alderman, *supra*, § 1.43–54, at 176. Because Esselen no longer retained

---

1. Although title passed from Esselen to Crysen as soon as the vessel delivered and tendered the oil at the Hudson Avenue terminal, title did not necessarily pass between Crysen and Con Edison at the same time, since their contract explicitly states that "[t]itle to and risk of loss of the fuel oil shall pass from Seller [Crysen] to Buyer [Con Edison] when and as the fuel oil passes through the first flange of Buyer's receiving facility." Therefore, if the oil were misappropriated before it reached Con Edison's flanges (pipes), Crysen would have had title to it at the time of the tort, and thus may bring an action in tort against Con Edison pursuant to section 2–722.

title or an insurable interest in the oil once it was delivered to the Hudson Avenue terminal, it no longer had a risk of loss.

### E. *"Assumed" Risk of Loss*

Even if Esselen has no security interest, insurable interest, title, or risk of loss in the goods, section 2–722(a) allows Esselen to bring a tort action against Con Edison if it can establish that it "has since the injury assumed that risk [of loss] as against the other." Finding that Crysen had denied any responsibility for the missing oil and that Esselen's claim against Con Edison for the purchase price of the allegedly diverted oil could be severed from Crysen's claim against Con Edison for lost profits on the oil, the district court held that Esselen had assumed the risk of loss for the missing oil and thus could maintain its tort action against Con Edison pursuant to UCC section 2–722.

We disagree with the district court's conclusion that Esselen since the injury has assumed the risk of loss with respect to the missing oil. If the party who in fact involuntarily suffers a loss is, simply by virtue of that fact, deemed to have assumed the risk of loss, then section 2–509 of the UCC, the provision dealing with allocation of risk of loss between parties, is rendered superfluous. We think that assumption of risk of loss requires something more than a party's actual bearing of loss; it requires an affirmative agreement by the parties to allocate risk of loss in a manner other than that provided for under section 2–509. Therefore, if a party who is not allocated the risk of loss under UCC section 2–509 agrees, after the injury, to seek recovery solely from the alleged third-party tortfeasor, and not from the party who under section 2–509 should have borne the risk of loss, then we think that party normally may be said to have assumed the risk of loss since the injury. *Cf. National Compressor Corp. v. Carrow*, 417 F.2d 97, 101 (8th Cir.1969) (holding that seller of goods that were destroyed by fire had since the injury assumed the risk of loss by accepting purchaser's cancellation of its order, and thus could bring tort action against third party).

In this case, Esselen, like Crysen's other unsecured creditors, has by virtue of nonpayment suffered a loss. As such, Esselen should not now, in effect, be able to obtain priority over Crysen's other unsecured creditors by seeking recovery directly from Con Edison rather than from Crysen's estate. Nothing in the record suggests that Esselen has given up any claim it may have against Crysen and thereby "assumed" the risk of loss for the missing oil. Esselen sued Crysen in 1986 on this matter; plainly, at that time, it had not assumed the risk of loss. Although Esselen voluntarily dismissed this claim after Crysen filed for reorganization, the dismissal was without prejudice. Therefore, whatever the merits may be of a claim by Esselen against Crysen, the claim apparently has not been released. Because it is possible that Esselen, in the event it fails to recover in tort from Con Edison, may still seek to recover in contract from Crysen's estate on grounds that Crysen under the UCC had the risk of loss for the missing oil, we think it fair to hold that Esselen has not assumed the risk of loss since the injury. *See Farbwerke Hoeschst A.G. v. M/V "Don Nicky"*, 589 F.2d 795, 797 (5th Cir.1979) (holding that shipper could not maintain tort claim against carrier since risk of loss and title to goods had passed to consignee, who was thus the real party in interest); *Aetna Ins. Co. v. S.S. Ortiguera*, 583 F.Supp. 671, 674 (S.D.N.Y.1984) ("As between a shipper who has parted with title to goods and a consignee who has not paid for the goods, even on a c.i.f. contract, the consignee generally is the proper party to sue the carrier for damage to the goods or breach of the contract of carriage." (citing UCC § 2–722)).

Because Esselen does not have title, an insurable interest, a security interest, or legal or assumed risk of loss with respect to the missing oil, we hold that Esselen may not press a tort claim against Con Edison and that the tort action is the exclusive property of Crysen's bankruptcy estate. However, even if Esselen had released its claim against Crysen and "assumed" the risk of loss since the injury

pursuant to UCC section 2–722, we think that Esselen would still be barred from prosecuting this action against Con Edison.

■ In this connection we note that the price Crysen charged Con Edison for the oil exceeded the price it paid Esselen for purchase of the oil. Unless we are to ignore principles of collateral estoppel and res judicata and say that Con Edison is subject to suit twice for the same occurrence, once by Esselen for the revenue Esselen would have received from Crysen but for Con Edison's alleged tort, and once by Crysen for its "lost profits" on the diverted oil, we would, in order to allow Esselen to prosecute this action without prejudicing Crysen's right to recover its profit on the price of the diverted oil, have to allow Esselen to seek recovery on behalf of Crysen. Because the reorganization aspect of this controversy prevents any party other than the trustee from bringing suit or seeking recovery on behalf of the debtor, *see In re Teltronics Servs., Inc.*, 762 F.2d 185, 189 (2nd Cir.1985); *In re Chateaugay Corp.*, 78 B.R. at 725, we find that Esselen is barred from prosecuting its tort action against Con Edison. Accordingly, we reverse the portion of the district court's judgment that reversed the bankruptcy court's order enjoining Esselen from pursuing the tort action.

## 2. *Sanctions Against Esselen for Violation of the Automatic Stay*

■ Even though we hold that Esselen violated the automatic stay in pursuing its Eastern District action, we do not find the bankruptcy court's imposition of sanctions including attorneys' fees and costs against Esselen, pursuant to 11 U.S.C. § 362(h) (1988), to have been warranted. Although Esselen should have sought the advice of the bankruptcy court as to the applicability of the automatic stay to the right of action against Con Edison before initiating the Eastern District action, we think the legal standard governing the imposition of section 362(h) sanctions at the time Esselen initiated its Eastern District action was sufficiently unsettled in this circuit that the award against Esselen was not justified.

Subsection (h) of 11 U.S.C. § 362 provides that "[a]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." Prior to the enactment in 1984 of subsection (h), sanctions against willful violations of automatic stays were imposed pursuant to the authority of bankruptcy courts to order parties in contempt. Accordingly, the standard that governed the imposition of sanctions was that which governed contempt proceedings: a party generally would not have sanctions imposed for its violation of an automatic stay as long as it had acted without maliciousness and had had a good faith argument and belief that its actions did not violate the stay. *See, e.g., In re Comtek Elecs.*, 28 B.R. 829, 832 (Bankr.S.D.N.Y.1983) (declining to hold landlord in contempt for maintaining eviction proceeding in violation of automatic stay where there was bona fide dispute as to whether debtor was in fact the tenant in possession of leased premises).

The enactment of subsection (h) granted bankruptcy courts an independent statutory basis, apart from their contempt power, to order sanctions against violators of automatic stays. Some circuits accordingly have read the provision as allowing a standard less stringent than maliciousness or bad faith to govern the imposition of sanctions in bankruptcy cases. *See In re Atlantic Business and Community Corp.*, 901 F.2d 325 (3d Cir.1990) (knowledge of existence of stay and deliberate act violating stay are sufficient for award of sanctions); *In re Taylor*, 884 F.2d 478, 482–83 (9th Cir.1989) (creditors' alleged good-faith reliance on advice of counsel that stay had been validly terminated was not defense to claim brought by debtor for actual damages based on creditors' alleged willful violation of stay); *In re Bloom*, 875 F.2d 224, 227 (9th Cir.1989) (" 'A "willful violation" does not require a specific intent to violate the automatic stay. Rather, the statute [11 U.S.C. § 362(h) ] provides for damages upon a finding that the defendant knew of

the automatic stay and that the defendant's actions which violated the stay were intentional.'" (quoting *In re INSLAW, Inc.*, 83 B.R. 89, 165 (Bankr.D.D.C.1988))).

 The standard governing the imposition of sanctions pursuant to 11 U.S.C. § 362(h) is one of first impression for this court. In enunciating this standard, we find persuasive the reasoning adopted by the other circuits and conclude that any deliberate act taken in violation of a stay, which the violator knows to be in existence, justifies an award of actual damages. An additional finding of maliciousness or bad faith on the part of the offending creditor warrants the further imposition of punitive damages pursuant to 11 U.S.C. § 362(h). This standard encourages would-be violators to obtain declaratory judgments before seeking to vindicate their interests in violation of an automatic stay, and thereby protects debtors' estates from incurring potentially unnecessary legal expenses in prosecuting stay violations.

Although we think this standard should apply to the future imposition of sanctions arising out of stay violations, we decline to apply the standard to the case at hand. Given the previously uncertain legal standard governing section 362(h), Esselen could not have known at the time it initiated its Eastern District action that it was subjecting itself to sanctions by not first seeking declaration from the bankruptcy court, having as it did a good-faith belief that its action did not violate Crysen's automatic stay. We therefore affirm the district court's reversal of the bankruptcy court's award of attorneys' fees against Esselen. In so doing, we save for another day the intriguing question whether, when the addition of subsection (h) was made to section 362, its language expressly applicable to provide relief only to "[a]n individual" should in some way be construed to permit relief to corporate entities such as Crysen for willful violations of the automatic stay. *Compare Budget Serv. Co. v. Better Homes of Va., Inc.*, 804 F.2d 289, 292 (4th Cir.1986) (holding that "individual" in section 362(h) includes corporate debtors), *and Atlantic Business and Commu-*

*nity Corp., supra* (following *Budget Serv. Co.*), *with 2 Collier on Bankruptcy* ¶ 362.12, at 362–75 to –76 (L. King 15th ed. 1989) (assuming that protections of subsection (h) apply only to individuals).

Judgment in accordance with opinion, with costs on appeal to appellant Crysen.