**IN RE Brian Keith BAETZ, Jennifer Rebecca Baetz, Debtors.**

**Bankruptcy Case No. 12–10519 EEB**

United States Bankruptcy
Court, D. Colorado

February 21, 2013

Brenda L. Bartels, 102 S. Tejon St., Ste. 800, Colorado Springs, CO 80903, for Debtors.

Chapter 7

**ORDER ON DEBTORS' REQUEST FOR DAMAGES ATTRIBUTABLE TO LANDLORD'S ALLEGED STAY VIOLATIONS**

Elizabeth E. Brown, Bankruptcy Judge

THIS MATTER came before the Court on the Debtors' March 6, 2012 letter, alleging violations of the automatic stay against their former landlord, Brookside Properties, LLC ("Brookside"), the owner of Brookside, Scott Schwartz ("Schwartz"), and its property manager, Margarita Ronquillo ("Ronquillo"). The Debtors complain of numerous actions taken by the landlord following their bankruptcy filing, including demand notices for payment, eviction proceedings, removal and sequestration of their possessions, and setoff of their security deposit. The whole story, however, reveals that the Debtors played a significant role in encouraging the landlord to take these actions. This case requires the Court to first consider the scope and duration of the automatic stay in regard to each type of alleged violation. Then the Court must consider the extent to which equitable considerations may bar a debtor's recovery of what are otherwise mandatory sanctions imposed by 11 U.S.C. § 362(k) for stay violations.

## I. FACTUAL BACKGROUND

In May, 2011, the Debtors leased an apartment from Brookside, with a lease term ending on June 30, 2012. From the beginning, they were behind in their rent and deposit obligations. In fact, they, or at least Mr. Baetz, had a history of not paying rent as their schedules list debts attributable to other landlords.

As early as October 2011, the Debtors were contemplating filing a chapter 7 bankruptcy. They informed their landlord of their plans, but promised that they would not list Brookside as a creditor. In a letter dated October 11, 2011, the Debtors stated:

> We agree that Brookside Properties or any of its agents will not be included in our pending chapter 7 bankrupsy [sic]. A seperate [sic] agreement will be prepared and signed by us when completed by representative preparing our bankrupsy [sic]. It is understood that this will stop current eviction proceedings. [sic] but will not stop future proceedings should we not keep payment arrangements.

The letter set forth a detailed payment arrangement to cure their arrears. They made these promises in order to induce Brookside to stop a pending eviction action.

On January 12, 2012, the Debtors finally filed their chapter 7 petition. They intentionally left Brookside off the list of creditors. Unaware of the bankruptcy filing, that same day, Brookside served the Debtors with a Demand for Compliance or Right to Possession Notice (an "Eviction Notice"), demanding payment of $1,690.50, which represented the amount of pre-petition rent due. Both Schwartz and Ronquillo testified credibly that Mrs. Baetz had requested this Eviction Notice so that

the Debtors could present it to various local churches to aid in their solicitation of donations.

Apparently, the donations were not forthcoming or were not used toward the rent arrears because the Debtors missed their scheduled January 13, 2012 payment. They did pay the scheduled January 27, 2012 payment, even managing to pay it a few days early, which brought the balance of their pre-petition arrears to $1,390.50. As to the missed payment, the Debtors reassured Schwartz that they would be able to fulfill their arrangement once they obtained their tax refund in early 2012.

The Debtors attended their creditors' meeting on February 7, 2012. At the meeting, they learned that they had to turn over the tax refund to the trustee and, therefore, they could not use it to retire their debt to Brookside. On February 23, 2012, they amended their schedules to include Brookside in the list of creditors. They attempted to give copies of the amendments to Ronquillo this same day, but she refused to accept them. She left them a letter later that evening stating, "I believe that I am not the right person to deliver such as [sic] information And [sic] I believe that he does not deserve it either. I asked him several times to help you and do not evict you [sic]." Undeterred, the Debtors delivered copies to Schwartz on February 24, 2012. Schwartz consulted with an attorney who advised him that, while he could not attempt to collect the pre-petition rent, he could nevertheless proceed with eviction for any post-petition rent past due. Later that evening, Schwartz, Ronquillo, and the Debtors met. The Debtors offered a $100 payment. Ronquillo handed the Debtors an amended Eviction Notice, giving credit for this $100, and listing the remaining balance of post-petition rent outstanding.

Over the course of the next two weeks, the Debtors made additional promises and partial payments. On February 27, 2012, the Debtors signed a promissory note purporting to reaffirm their pre-petition obligations. They did not present this informal reaffirmation agreement for approval by the bankruptcy court. On February 29, 2012, they paid an additional $600. After receipt of this payment, Brookside presented the Debtors with an updated Eviction Notice, reflecting the balance owed for post-petition rent. On March 6, 2012, the Court received the Debtors' letter alleging a violation of the automatic stay. Contrary to this position, a day or two later, they signed a stipulation with Brookside, agreeing to a new repayment arrangement in order to stop the pending eviction action. They filed the stipulation with the county court. Predictably, they failed to make the scheduled March 9, 2012 payment. On March 20, 2012, Brookside requested the entry of judgment in the eviction action and the court summarily granted it. The next day the Debtors asked the county court to vacate its judgment, informing the court for the first time of their bankruptcy filing. The court promptly vacated its Order on March 29, 2012.

Before the court vacated its Order, the Debtors gave Schwartz a note on March 26, 2012, stating, "We will be back tomorrow evening after work to finish our move out and clean up. We should be out by 9 pm tomorrow night." A neighbor in the apartment complex, Theresa Abbott, testified that the Debtors gave her a set of keys to the apartment and mailbox on March 27, 2012 and set a time to retrieve them from her the following day so that they could complete their move. They did not return the following day. They left behind in their apartment some of their furniture, plants, dirty dishes, and pots and pans.

On April 1, 2012, Schwartz entered the apartment and sprayed for ants. Schwartz testified that he, Ronquillo, and Robert Peterson then spent two days cleaning up the Debtors' mess. During cleanup, they disposed of the dishes, pots, and pans. Peterson testified that the dishes might have been salvageable, but the pots and pans were not. They moved most of the remaining personal property into storage, but Ronquillo kept in her apartment the plants, an entertainment center, and the Debtors' loveseat and couch. On April 24, 2012, Brookside sent a Notice of Security Deposit Withholding. The Notice included pre-petition rent. Schwartz testified it was his understanding that he was required by law to include everything in this notice, but that he was not attempting to collect the pre-petition rent.

The Debtors did not return to retrieve their personal property until June 20, 2012. On this day, Mrs. Baetz rang the bell for Ronquillo, who appeared briefly at the window, but would not open the door. On July 2, 2012, the Debtors came back again. This time Schwartz met with them, but would not allow them to retrieve their property until they returned their keys. The Debtors eventually agreed to turn over the keys, but soon thereafter a heated disagreement arose over whether the Debtors would sign a receipt acknowledging the return of their stored property. The Debtors left without their property. Afterwards the parties agreed, through counsel, that Brookside would deliver the personal property to the residence of a friend of the Debtors on July 23, 2012, at 6:00 p.m.

On this day, Schwartz and two of his helpers delivered the property early,

around 4:45 p.m. and they left it at the curb. The residence belonged to Lisa Moss. Her mother, Kathy Gardner, was present when Schwartz began unloading the property. She immediately called her daughter. Moss talked with Schwartz by phone, demanding that the property be placed on the driveway and not by the curb. Schwartz insisted that Ms. Gardner sign a receipt for the property before he would agree to move it again. She signed the receipt, Schwartz moved the property, and then he left. Two days later, he returned to Moss's house to retrieve a mattress that did not belong to the Debtors. The Debtors requested its removal because they were worried it might contain bed bugs, but they gave no indication that it infested any of their property or that they suffered any damages attributable to this mattress.

## II. DISCUSSION

### A. General Principles

The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.[1]

Among other things, the stay prevents a creditor from taking any action to collect a prepetition debt or to enforce its lien rights, including the following provisions that are implicated by the facts of this case:

> (1) the commencement or continuation, . . . of a judicial, administrative, or other action or proceeding against the debtor . . . to recover a claim against the debtor

---

1. H.R.Rep. No. 95–595, at 340 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6296–97, 1977

WL 9628 (capitalization altered).

. . .

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

. . .

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case . . . ;

(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; . . . .[2]

Under this statutory framework, once a debtor informs his creditors of his bankruptcy filing, he is not required to do anything else. The automatic stay operates as its name states—"automatically." This breathing spell, however, is only a temporary measure. Just as it springs into being automatically, it also terminates automatically following certain events. Those provisions of § 362(a) that protect property of the estate lapse once the property is no longer property of the estate.[3] All other provisions remain in effect only until the *earlier* of dismissal, case closing, or the entry of a discharge order in the case of an individual chapter 7 debtor (and certain other debtors).[4] At the conclusion of the typical chapter 7 case, the automatic stay is replaced by the discharge injunction set forth in § 524. The discharge injunction eliminates the debtor's personal liability for the pre-petition debt owed to the creditor (unless it is a non-dischargeable debt), but it does not eliminate any lien rights that may exist.

 In order to impose sanctions against a creditor for violating the stay, the Court must first find the creditor's actions were "willful." In order for a violation to be "willful,"[5] evidence of specific intent to violate the stay is not required. Violations are "willful" if the party knew of the automatic stay and intended to take the actions that violated the stay. A party's good faith belief that it has a right to the property at issue is not relevant to a determination of whether the act was "willful" or whether compensation must be awarded.[6] Even an innocent stay violation (one committed without knowledge of the stay) becomes willful, if the creditor fails to remedy the violation after receiving notice of the stay.[7] In effect, the term "willfull" refers to the deliberateness of the conduct, coupled with knowledge of the filing. It does not require an intent to violate a court order. Once a court finds a violation of the stay to be willful, § 362(k) ordinarily makes the award of damages for injuries mandatory.[8]

**B. Analysis of Potential Stay Violations**

 Applying these general principles, the Court first notes that the relevant time

**2.** 11 U.S.C. § 362(a).

**3.** 11 U.S.C. § 362(c)(1).

**4.** 11 U.S.C. § 362(c)(2).

**5.** 11 U.S.C. § 362(k).

**6.** *In re Diviney,* 225 B.R. 762, 774 (10th Cir. BAP 1998). *See also, Goichman v. Bloom (In re Bloom),* 875 F.2d 224, 227 (9th Cir.1989); *In re Crysen/Montenay Energy Co.,* 902 F.2d 1098, 1104–05 (2d Cir.1990); *Budget Serv. Co.*

*v. Better Homes of Virginia, Inc.,* 804 F.2d 289, 293 (4th Cir.1986).

**7.** *In re Diviney,* 225 B.R. at 776; *Taborski v. United States,* 141 B.R. 959, 967 (N.D.Ill. 1992); *In re Abrams,* 127 B.R. 239, 241–44 (9th Cir. BAP 1991).

**8.** *In re Mullarkey,* 81 B.R. 280, 284 (Bankr. D.N.J.1987); *Tel–A–Communications Consultants v. Auto–Use (In re Tel–ACommunications Consultants, Inc.),* 50 B.R. 250, 255 (Bankr. D.Conn.1985).

period for determining the respondents' liability begins on February 23, 2012, the date on which the Debtors first informed Brookside and its agents of the bankruptcy filing. When the stay terminated differs depending on whether the actions complained of involved property of the estate or not and at what stage in the bankruptcy proceedings they occurred. The Court must also explore the scope of the automatic stay, which, while undeniably broad, does have some outer limits.

### 1. Attempts to Collect Rent

█ From the time Brookside learned of the bankruptcy filing until the end of March, the parties went back and forth between the Debtors offering various repayment proposals and the landlord pursuing an eviction. Clearly, the automatic stay prevents creditors from acting to collect a debt or to commence or continue legal proceedings.[9] The language of § 362(a), however, prohibits only proceedings and collection activity that attempts to collect a *pre-petition* debt. After Brookside consulted its attorney on or about February 24, 2012, it attempted only to collect post-petition rent. It was the Debtors who offered payment plans to their landlord that included both pre- and post-petition debt. At trial, the parties disputed whether the post-petition payments were intended to be applied toward pre-petition debt, but with each post-petition payment, the landlord provided an updated Eviction Notice, reflecting only the remaining post-petition balance. Thus, nei-

ther the negotiations, the stipulations, nor the Eviction Notices constituted stay violations.

### 2. Eviction Proceedings

█ The act to evict the Debtors from the apartment, however, may constitute a technical violation of the stay. The Debtors' interest in this residential lease became property of their estate. Their bankruptcy trustee had sixty days, or until approximately March 12, 2012, in which to assume it, failing which it would be deemed rejected.[10] Not surprisingly, the trustee did not take any action to assume it. "[I]n virtually every Chapter 7 no-asset case the trustee realizes no benefit from assuming the debtor's residential lease, and thus in virtually every Chapter 7 no-asset case, the residential lease is deemed rejected...."[11]

█ "Rejection," however, is not synonymous with termination of the lease. Admittedly, this leasehold interest had inconsequential value to the estate. But was it nevertheless still a property interest of the estate and, therefore, protected by the automatic stay? There are several provisions in the Bankruptcy Code that either cause the trustee to surrender the leased property upon rejection or that provide explicitly that it is no longer property of the estate, but these provisions apply only to *non*-residential real property and personal property leases.[12] The rule of statutory construction known as *expressio unius est exclusio alterius*, provides that when the "persons and things to which [a

---

9. 11 U.S.C. § 362(a)(1) & (6).

10. 11 U.S.C. § 365(d)(1).

11. *In re Stoltz*, 315 F.3d 80, 85 n. 1 (2nd Cir.2002) (*quoting In re Sheard*, 1999 WL 454260 at *3 (Bankr.E.D.Pa. June 24, 1999)).

12. For non-residential real property lease provisions, *see, e.g.,* 11 U.S.C. § § 541(b)(2),

362(b)(10), 365(d)(4). For personal property leases, *see* 11 U.S.C. § 365(p)(1) ("If a lease of *personal* property is rejected or not timely assumed by the trustee ... the leased property is no longer property of the estate and the stay under section 362(a) is automatically terminated.") (emphasis added).

statute] refers are designated, there is an inference that all omissions should be understood as exclusions."[13] Arguably then, Congress' omission of residential leases means that they remain property of the estate despite their rejection, until either formal abandonment, case closing, or entry of an order granting stay relief.[14]

■ On the other hand, two circuit courts have noted, without substantial analysis, that the rejection of a residential real property lease constitutes an abandonment and, therefore, the property is no longer property of the estate.[15] Technically, mere rejection does not satisfy the requirements of § 554, which governs abandonment of property of the estate. Although there may be grounds to seek abandonment when property of the estate is of inconsequential value and benefit to the estate, § 554(a) requires "notice and a hearing" before abandonment may occur based on its inconsequential value.

These circuit court decisions, however, provide a much needed practical result. If there is nothing left for the estate to do with a residential lease following its rejection, there does not appear to be any good reason to require landlords to seek stay relief remedies. Perhaps the omission of residential leases from these Code sections that explicitly provide for surrender and "non-property of the estate" status reflects nothing more than superior lobbying efforts of commercial lessors, rather than a conscious choice to exclude residential leases. Nevertheless, the Tenth Circuit has yet to weigh in on this issue. For this reason, landlords in this district would be well advised to seek stay relief if they seek to terminate a lease and evict the debtor before the termination of the automatic stay, even if they are seeking to do so only on the basis of past due *post*-petition rent. An ounce of prevention is worth a pound of cure. A lesson no doubt well learned by Brookside at this point.

### 3. Removal and Storage of the Debtors' Possessions

■ In this case, the landlord took possession of the Debtors' belongings on April 1, 2012 when it moved them into storage and it retained possession until July 23, 2012, when it delivered them in accordance with the Debtors' instructions. The Debtors have complained that the landlord's removal and sequestration of their possessions constituted acts to obtain possession or exercise control over property of the estate. First, the language of § 362(a)(3), which prohibits acts to take possession or exercise control, protects only "property of the estate." The Debtors' possessions ceased to be property of the estate by March 7, 2012. All of their possessions were claimed as exempt property in their schedules. The Debtors' creditors' meeting concluded on February 7, 2012, and no one objected to any of their claimed exemptions within 30 days following the conclusion of the creditors' meeting, as required by Fed. R. Bankr.Proc. Rule 4003(b)(1). Thus, by March 7, 2012, the Debtors' exemptions had ripened. As a result, their possessions reverted to their pre-bankruptcy status as property of the debtor. Section 362(a) does not prevent a

---

**13.** 2A Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutes and Statutory Construction* § 47:23 (7th ed. 2007).

**14.** 11 U.S.C. §§ 362(c)(1), 554.

**15.** *In re Stoltz*, 315 F.3d at 85, n. 1; *In re Biggs*, 271 Fed.Appx. 286, 288 (3d Cir.2008) (not selected for publication) (relying only on

*In re Stoltz* for this proposition); *In re Rodall*, 165 B.R. 506 (Bankr.M.D.Fla.1994); *In re Reed*, 94 B.R. 48 (E.D.Penn.1988). *But see In re Thompson–Mendez*, 321 B.R. 814 (Bankr. D.Md.2005) (deemed rejected residential lease not considered abandoned and, therefore, stay relief was required).

creditor from exercising control over property of the debtor, unless it is in furtherance of a lien securing a pre-petition debt (prohibited by § 362(a)(5)) or in an attempt to collect a pre-petition debt (prohibited by § 362(a)(6)).

In reality, the Debtors abandoned these possessions when they vacated the apartment on March 26, 2012. They did not return to reclaim them until June 20, 2012, almost three months later. Did they expect their landlord to keep the apartment unoccupied indefinitely? Or to store their possessions for free indefinitely? Or would they have preferred that it put them out by the curb, where anyone could take them? What the Debtors complain of most is not the fact that the landlord moved their possessions out of the apartment, but that the landlord frustrated their attempts to reclaim them in June and July. At this point in time, these possessions were no longer under the umbrella protection of the automatic stay. The discharge injunction had replaced the stay and, thus, still prevented any attempt to collect pre-petition debts, but the landlord did not withhold the possessions in order to extract payment of pre-petition debt. Schwartz demanded the return of the Debtors' keys and a signature acknowledging their receipt of the goods. Undoubtedly, he wanted to know that he was "done" with these Debtors, as they would no longer have access to the apartment building and could not make a claim that he had failed to return their possessions.

### 4. Offset of Security Deposit

■ The only remaining matter is the Notice of Security Deposit Withholding. On April 24, 2012, the landlord informed the Debtors of its intention to offset the Debtors' deposit against their outstanding pre- and post-petition rent obligations. Schwartz testified that he did not intend to use the offset against pre-petition debt,

but thought he was obligated to list all defaults in order to satisfy state law. Even if he had only listed post-petition debt, he would nevertheless have run afoul of the automatic stay. As previously mentioned, § 362(a)(7) prohibits "the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against *any* claim against the debtor . . . ." (emphasis added). Most of the provisions of § 362(a) apply to actions taken with respect to pre-petition debts. Curiously, this setoff provision applies to *any* debt owed by the debtor—pre- or post-petition debt. Thus, for as long as the automatic stay remained in existence, it prohibited Brookside from offsetting its pre-petition obligation to return the deposit against any debt owed by the Debtors, even against their post-petition rent obligations.

The Debtors claimed the deposit as exempt property on their Schedule C. They did so on the basis of a homestead exemption, which clearly does not apply to a rent deposit. But neither the trustee nor any other party in interest objected to its exemption before the deadline for objections and, therefore, this exemption ripened. Consequently, the deposit was no longer property of the estate as of March 7, 2012. As with the possessions discussed above, the deposit then reverted to its pre-bankruptcy status as property of the debtor. As such, it continued to enjoy the protection of the automatic stay until the Debtors obtained their discharge on May 17, 2012. Thus, the April setoff violated the automatic stay.

### C. Application of Equitable Principles

■ From a cold reading of the facts of this case, it may appear that the landlord and its agents violated the stay with no care or heed of the consequences.

What became clear to the Court from listening to the testimony, however, was that the Debtors in this case orchestrated a scheme to dupe the landlord. They were the ones to reassure the landlord that its debt would not be covered by the bankruptcy filing. Once they changed their mind, after learning they could not use the tax refund to pay some of the past due rent, and after having run up a significant post-petition rent obligation, they amended their schedules to include the landlord and informed it of this change. The landlord immediately consulted with counsel and from that point forward took no steps to collect anything other than post-petition rent. But every time the landlord got close to an eviction based on the post-petition rent, the Debtors were the ones to offer a new payment plan. They were the ones to include pre-petition rent in the stipulations. With all of the back and forth between these parties from February 23 to March 6, the Debtors never once made mention of their right to the protection of the automatic stay. After filing the March 6, 2012 letter with the Court alleging stay violations, they still continued to approach the landlord with informal agreements to reaffirm the debt. On the basis of observing the demeanor of the witnesses, the Court formed the impression of dishonest debtors who misled the landlord and its agents, and who were attempting to play games with the bankruptcy process.

■■■ The Tenth Circuit has recognized a narrow exception for circumstances in which it would be inequitable to impose liability for a stay violation. In Calder v. Calder,[16] the debtor actively litigated in a state court action after his Chapter 13 filing and did not provide notice of his bankruptcy until just before the state court was about to enter final judgment. The Tenth Circuit affirmed the bankruptcy court's allowance of the creditor's claim established by the post-petition state court judgment, despite the fact it had entered in violation of the stay.

> To hold otherwise and permit the automatic stay provision to be used as a trump card played after an unfavorable result was reached in state court, would be inconsistent with the underlying purpose of the automatic stay which is to give a debtor a " 'breathing spell from his creditors.' "[17]

Other courts agree that equitable principles may relieve a court from what is otherwise a mandatory obligation to impose sanctions for stay violations.[18]

*Calder's* ruling is not limited to its particular facts.

> *Calder* stated that equitable principles could be applied "at least where the creditor was without actual knowledge of the bankruptcy and the bankrupt's unreasonable behavior contributed to the debtor's plight." Similarly, the Tenth Circuit Bankruptcy Appellate Panel did not narrow the *Calder* holding when explaining that "[c]ircumstances that trigger equitable considerations" merely "include" those outlined in *Calder*. Indeed, the Tenth Circuit in *Calder* favorably cited cases that exceeded its own

---

**16.** *Calder v. Calder,* 907 F.2d 953 (10th Cir. 1990).

**17.** *Id.* at 956–57 (citations omitted).

**18.** *See, e.g., In re Onyx Inv., LLC,* 2007 WL 1347696 (D.Kan.2007); *In re Sole Survivor Corp.,* 2009 WL 210471 (C.D.Cal.2009); *In re Barclay,* 337 B.R. 728 (6th Cir. BAP 2006); *In re Patrick,* 2003 WL 21309201 (Bankr.D.Colo. 2003); *In re Clayton,* 235 B.R. 801 (Bankr. M.D.N.C.1998); *In re Cinematronics,* 111 B.R. 892 (Bankr.S.D.Cal.1990).

limited facts.[19]

 Relying on equitable principles in this context is akin to applying the doctrine of "unclean hands." This doctrine should be used only when there is a close nexus between a party's unethical conduct and the transactions on which that party seeks relief.[20] In other words, courts may only apply "the unclean hands doctrine to prevent a party from using the courts to reap the benefits of [its] wrongdoing."[21] The doctrine of unclean hands may be raised by the Court *sua sponte*.[22]

The Court recognizes that this equitable exception must be applied very sparingly. "[T]here must be compelling equitable considerations which outweigh the court's need for enforcement of an orderly administration of the bankruptcy estate ... to insure that there is no suffocation of the stay's intended policy."[23] It must not be used simply to relieve a creditor whenever the creditor failed to appreciate that his actions would violate the stay. If it were used in such a manner, it would violate the general rule that a stay is "willful" when a creditor has knowledge of the stay and takes an action that violates it, whether or not he appreciates that his action constitutes a violation.

This equitable exception should be limited to those situations in which the debtor's own conduct bears a significant portion of the responsibility for creating the stay violation. It is the firm conviction of this Court that the technical violations committed by Brookside and its agents were in large part caused by the Debtors' statements and actions lulling them into a false sense of security. "The automatic stay was not designed to be used as a kind of spring-loaded gun against creditors who wander into traps baited by the debtor."[24]

## III. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that the Debtors' request for the imposition of sanctions against the respondents is hereby DENIED.

---

**19.** *In re Onyx Inv., LLC*, 2007 WL 1347696, *8 (citations omitted).

**20.** *In re Uwimana*, 274 F.3d 806, 810 (4th Cir.2001) (*citing Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245, 54 S.Ct. 146, 78 L.Ed. 293 (1933)).

**21.** *Id.* at 811.

**22.** *In re Rawles*, 2009 WL 2924005, *3 (Bankr.D.Md.2009) (citations omitted).

**23.** *In re Cinematronics*, 111 B.R. at 901.

**24.** *In re Clayton*, 235 B.R. at 807.